| 29 | 751 |
| 35 | 701 |
| 29 | 751 |
| 37 | 753 |

# WHEELING.

STATE *ex rel.* NEIDER *v.* REUFF.

Submitted June 4, 1887—Decided June 25, 1887,

1. PARENT AND CHILD—APPRENTICE.

The authority of a father to dispose of the custody of his minor child in any other manner than by lawfully binding him as an apprentice or appointing for him a testamentary guardian, ceases at the time of the father's death. (p 762.)

2. PARENT AND CHILD—CUSTODY—MOTHER.

A father cannot by any instrument in writing or otherwise, relinquish or surrender to another, the custody of the person of his minor child, so as to deprive the mother of such child, after the father's death, of her right to the custody thereof, and to the care of its education. (p 762.)

3. PARENT AND CHILD—CUSTODY—MOTHER.

As a general rule, the father during his lifetime, and after his death, the mother, is entitled to the custody of the person of their minor child. (p. 763.)

4. PARENT AND CHILD—CUSTODY—MOTHER.

The right of the father or mother to the custody of their minor

child, is not an absolute right, to be accorded to them under all
circumstances, for it may be denied to either of them, if it appears
to the court, that the parent otherwise entitled to this right, "is
unfit for the trust." (p. 761.)

5. PARENT AND CHILD—*Habeas Corpus*—CUSTODY—MOTHER.

Upon the hearing of a writ of *habeas corpus*, sued out by the
mother after the death of her husband to obtain the custody of
their minor child, and it appears from the return to the writ, or
otherwise, that the mother shortly before, had been insane, it is
proper for the court or judge before whom the same is pending
to cause such further inquiry to be made, as will enable the court
to determine, whether she is fit to be entrusted with the custody of
her child. (p. 764.)

6. PARENT AND CHILD—*Habeas Corpus*—CUSTODY—CONTINUANCE.

If upon the hearing of a writ of *habeas corpus*, it is apparent that
proof of an existing fact essential to a correct determination of the
controversy has been omitted and, that such proof can be readily
obtained, and the condition of the proceeding is such, that with-
out injury to the opposite party the same may be done, the court
should delay the final hearing thereof for a reasonable time, that
proof of such material fact may be supplied. (p. 764.)

7. PARENT AND CHILD—APPRENTICE—GUARDIAN—MOTHER.

In this State a minor child can only be bound as an apprentice,
"by his father, or if none, by his guardian, or if neither father nor
guardian, by his mother, with the consent entered of record of
the County Court of the county in which the minor resides;
or without such consent, if the minor being fourteen years of
age, agree in writing to be so bound; or unless such minor be
found begging in such county, or is likely to become chargeable
thereto;" and if not so bound, the indentures of apprenticeship
are void. (p. 760.)

*W. P. Hubbard* and *D. O'Keef* for plaintiff in error.

No appearance for defendant in error.

WOODS, JUDGE :

On the 8th day of February, 1886, Mary Neider presented
her petition to one of the judges of the Circuit Court of
Ohio county, alleging, that she is the mother of Agnes
Neider, aged less than three years, whose father, her hus-
band, died on the — day of ——, 1885; that said child is un-
lawfully detained in said county from her care, control and
custody, and that she is deprived of her lawful right by one

George Reuff,—and prayed, that the writ of *habeas corpus ad subjiciendum* might be granted her, to free her child from unlawful custody, commanding him to produce the body of the child, and that she might be awarded the custody thereof.

By the order of the judge, made in vacation, on the 8th day of February, 1886, the writ was issued, returnable to the 10th day of February, 1886, and was executed the next day. On the 5th day of January, 1887, Reuff produced the child in court, and made return to the writ in substance:—That he has, and is entitled to have, the lawful care and custody of the child, Agnes Neider, because he says, that on the 15th day of October, 1884, Mary Neider (the relator), the mother of the child, being insane, and an inmate of the hospital for the insane at Weston in this State, having been duly and legally adjudged insane and duly committed to said hospital according to law, Nicholas Neider, the father of said child, having the lawful custody thereof, placed her in the custody of "The Children's Home of the City of Wheeling," a corporation created and existing in the city of Wheeling under chapter 55 of the Code of West Virginia, and by an instrument in writing executed by him, relinquished forever all power and control over her, and invested said "Children's Home" with the same power and control over her as he himself theretofore possessed; and that afterwards, on the 21st day of October, 1884, the "Children's Home" indentured her to him until she should become eighteen years of age, and gave him by virtue thereof the custody and care of the child; and that he has ever since provided for her in a comfortable manner, and treated her with kindness and affection, and she is in healthy, happy and comfortable condition, and that as he and his wife have no children, he regards this child with the same attachment and affection as he would a child of his own, and that since she has been in his care he is attending to her education in a manner essential to her tender years.

The instruments in writing made between the father and the "Home," whereby he relinquished to it the custody of the child, and whereby the "Home" pretended to bind her to the respondent, as well as the charter of the "Home" is-

sued by the recorder of Ohio county, are made parts of said return.

It is unnecessary to say anything further in reference to the contents of these instruments, except that by the charter of the "Children's Home," the purpose of its creation, is declared to be "for the purpose· of affording. a home, food, clothing and schooling for destitute or friendless children, and to place them with respectable families or persons to learn some useful trade or occupation."

The relator moved to quash, and also demurred to the return, which motions the court overruled.

On the 11th of January, 1887, the cause was finally heard, when the Circuit Court entered the following judgment :

"This day came again the parties by their attorneys, and the petitioner moved the court for an order and judgment that the petioner have the custody of the person of said infant, Agnes Neider, and that she be delivered by the respondent, George Reuff, to. the petitioner, Mary Neider, which motion was argued by counsel and overruled by the court, to which ruling the petitioner by counsel excepts ; and thereupon the court having heard this matter upon the petition and the return alone, doth consider that the respondent, George Reuff, do retain the custody and possession of the said Agnes Neider, and that respondent recover of the petitioner his costs by him about his defense in this behalf expended."

To this judgment the petitioner has obtained a writ of error.

The grounds of error assigned are :

1st. The action of the court in overruling the motion to quash the return, and in overruling the demurrer thereto.

2d. In overruling the relator's motion to have the custody of the person of her infant child.

This case presents for consideration, among others, the following questions :

What is the extent and duration of the father's right over the custody of the person and the care of the education of his minor child ?

In what manner and during what period may he dispose of the custody of such child during his lifetime ?

Under what circumstances does the right of the father to the custody of such child cease, and the mother succeed to this right to the custody of such child?

By whom and in what manner may such child be bound out as an apprentice? and—

What rights were acquired by the "Children's Home" to the custody of the child, Agnes Neider, by the agreement made with its father when he relinquished to the "Home" his control over the child; and what right was acquired from the "Home" by the respondent to the custody of the child?

From the view we have taken of this case it is unnecessary for us to consider whether the act of the legislature passed on the 3d of March, 1870, referred to in the agreement dated the 15th of October, 1884, entitled "An act to provide for orphans and destitute children," is constitutional or not, and therefore on this subject we express no opinion.

A careful examination of the authorities leads us to the conclusion that by the common law the father is entitled to the custody of his minor children and to the benefit of their labor while they live with and are maintained by him. This right grows out of his obligation to maintain and educate them, and is correlative to it, but this obligation continues only during the lifetime of the father.

While the common law imposes no obligation on the father to provide for the support of his infant children after his death, it does not confer upon him the right correlative to it, to bind them to service after his death. (*Johnson* v. *Terry*, 34 Conn. 259; *State Ex. Rel. Mayne* v. *Baldwin*, 1st Halst. N. J. Ch'y R. 454; *Campbell* v. *Cooper*, 34 N. H. 49; *Iermess* v. *Emmerson*, 15 N. H. 486; 1 Blk. Com. 452–3.)

An agreement by the father for the services of his minor child ceases to be binding on the minor at the death of his father unless made by indentures of apprenticeship in conformity with the provisions of some statute authorizing him to do so, and therefore a parol gift of the child by the father gives no right to the services of the child after the father's death.

The father is entitled to the custody of his minor children

as guardian by nature, and guardian by nurture, and this guardianship is a personal trust in the father, and he has no general power to transfer or give them to another, nor can he alienate his right to the custody and control of his minor child, except that he may bind it out as an apprentice. [1st Halst. 454 *supra* ; *People* v. *Mercein,* 3 Hill 399 (S. C., 38 Am. Decis. 644); *Queen* v. *Smith,* 16 L. and E. R. 221; *Day* v. *Everett,* 7 Mass. 145 ; *Moore* v. *Christian,* 56 Miss. 408 (S. C., 31 Am. Decis. 375) ; *Iermess* v. *Emmerson,* 15 N. H. 486.]

In *Queen* v. *Smith, supra,* it was decided, that where the father had agreed with the uncle of his infant child to permit it to live with the uncle, to be brought up and educated until it was grown up and the uncle had agreed to bring up and educate the child as his daughter, and in pursuance of this agreement the child was committed to the uncle, the father, notwithstanding the agreement, might revoke his consent ; and the court upon a writ of *habeas corpus* obtained by the father, was bound to order the child to be restored to the father's custody.

In *Day* v. *Everett, supra,* it was held that the father may contract that his minor son shall labor in the service of another for any period of time, *provided* the term do not exceed the period of the child's emancipation, which may take place as well on the father's death, as on the son's arriving at the age of twenty one years.

Where the father is dead, the mother becomes entitled to the custody of the minor children as guardian by nature, and guardian by nurture, notwithstanding the father in his lifetime had placed them in the custody of any other person to whom they had not been lawfully bound as apprentices.

In *Moore* v. *Christian, supra,* a father gave his son, ten years of age, to a man of good character and ample means, to keep him during his minority. The father dying three years afterwards, the mother sued out a *habeas corpus* for the child. The court held that she was entitled to the custody of the child, although she was poor and dependent, and the child preferred remaining with the respondent.

In this case it appeared, that the respondent was a man of good character, and some property. The mother was very poor and illiterate, dependent upon her daily labor in the

fields for the support of herself and five children, all of whom, save one, was younger than this son.

Chalmers, J., delivering the opinion of the court, said : " It is indeed held, that this right to the custody of children, given by nature and by God to parents, must give way to the permanent interest of the child, if it be shown, that the life, health or morals of the child will be prejudiced, or his usefulness as a citizen seriously jeopardised by remaining under the parental control; but it is not meant by this, that the courts can sit in judgment, whether a wealthy stranger can give to the child more worldly advantages than an indigent parent. This would be to make poverty a crime and to punish it with the bitterest penalties."

In *Pierce* v. *Massenburg*, 4 Leigh. 493, it was held, that a father cannot bind his infant child apprentice by indenture to which the child is not a party, and that indentures of apprenticeship executed by the father without the child's concurrence, are not only voidable but absolutely void. ( *The King* v. *Armsby*, 3 Barn. & Ald. 584; *the King* v. *Crawford*, 8 East. 25; *the King* v. *Ripon*, 9 East. 295.)

By the doctrines· of the common law, a father cannot bind his infant son apprentice, without the assent of the son, and such assent proved by his signature to the indenture; but that in this manner he may bind him.

In *Armstrong* v. *Stone and wife*, 9 Gratt. 102, it was held, that after the father being dead, the mother is entitled to the custody of their child as of right, and that she does not lose this right by a second marriage. But where she is seeking by the writ of *habeas corpus* to have the child placed in her custody, the court may exercise its discretion, and determine whether, under all the circumstances, it is best for the infant, that he should be assigned to the custody of his mother.

In this case, the father at his death left no estate, and the mother during her widowhood supported herself by her own labor, but the child was left with its paternal grandparents, who were proved to be persons of exemplary character, warmly attached to the child, whom they had treated with great tenderness and affection.

The mother and her second husband were persons of excellent moral character, and although married two years had no children, and the husband was an industrious young man, whose father was in good circumstances. The child was in its seventh year, too young to judge for itself, and having no legal guardian, there were no circumstances to induce the court in the exercise of a sound discretion to deprive the mother of the custody of her child.

In *Villareal* v. *Melish*, 2 Swant. Ch. R. 533, Mrs. Villareal by her having agreed with her father, that he should have the care of the persons and estates of her two infant children, and in the event of their death during minority should receive a moiety of their property, afterwards married again ; the court, upon the petition of the children, ordered, that they be delivered to their mother, as guardianship not being assignable at law or in equity, the right of the mother to be the guardian of her children continued notwithstanding her second marriage. Lord Eldon said, "her deed did not transfer the guardianship, and that her father under said deed gained no right to the guardianship of the children." ·

So where the wife of the petitioner on her death bed, with his consent, gave their infant child, then only five months old, to her mother for nurture, maintenance and education until she should reach the age of twenty one years, and the grandmother accepted the trust, took the child and raised it with the most tender care until it was seven years old, the child upon a *habeas corpus* sued out by the father, was ordered to be delivered into his custody.

Haymond, President, delivering the opinion of this Court, said: "I do not think, that the evidence in this case shows, that the petitioner has waived or abandoned his paternal right, by permitting his child to remain so long with its grandmother, or that he ever transferred or intended to pass his paternal rights to his child to the grandmother so as to deprive him of his legal right to require it." (*Rust* v. *Vanvacter*, 9 W. Va. 600.)

By the common law the natural right of the father to the custody of his infant child arose out of his duty to maintain and support it, and continued only so long as he was obliged to do so, and as this duty ceased with his life, so did his

right to control or direct the custody of the child, except where he had by indentures lawfully bound the child to another as an apprentice.

This right, however, was extended under certain circumstances after his death during the minority of the child, or for any less period by the statute of 12 Car. II., chap. 24, which authorized the father, although himself an infant, by deed or will to appoint guardians for such of his children, born or unborn, who were infants and unmarried at the time of his death, until they should respectively attain the age of twenty one years, or for any less time,—who were entitled to have the custody of the children as well as of their estates (1 Blk. Com. 562; 2 Ib. 88) and note 10. This provision of the English statute was with slight alterations inserted in the revised code of Virginia, sec. 1, chap. 108, R. C., 1819. The same provision was in substance inserted in sec. 1 of chap. 127 of the Code of 1849, but subject to the important qualification contained in the 7th section of that chapter, which declared that " every guardian who shall be appointed as aforesaid, (that is to say, in any of the modes prescribed in the 6 preceding sections of that chapter) shall have the custody of his ward, and the possession, care and management of his estate, real and personal, and out of the proceeds of such estate shall provide for his maintenance and education, but the father of the minor if living, and in case of his death, the mother, *while she remains unmarried*, shall, if fit for the trust, be entitled to the custody of the person of the minor and the care of his education."

These provisions of the Code of Virginia were in substance adopted by this State in the first seven sections of chapter 82 of the Code of West Virginia; but by the 7th section of that chapter as amended by sec. 7 of chapter 53 of the Acts of 1883, the cruel implication that the mother by a second marriage has rendered herself unworthy to have custody of the person of her own infant child, has been removed, for that section as amended declares, " that the father of the minor if living, and in case of his death, the mother, if fit for the trust shall be entitled to the custody of the minor, and to the care of his education."

Such was the legal status of the petitioner in this case,

when she sued out the writ of *habeas corpus* to regain the custody of her child.

Respondent rests his right to retain the child upon the the ground that she had been lawfully bound to him until she shall become twenty one years of age by "The Children's Home," by the indentures set out in his return to the writ. Respondent could not acquire from "The Home" any greater right to the custody of the child, that was acquired by it from the child's father by his agreement of the 15th October, 1884.

If we admit for the sake of the argument that "The Children's Home of the City of Wheeling" is an "orphan asylum" (which we do not mean to decide), and that as such, it was authorized by said act of the legislature passed March 3d, 1870, to take under its care and guardianship this infant child so voluntarily surrendered to it by its father as stated in said return, yet by the very terms of the statute, as well as terms of the instument surrendering the child, "The Home" could only acquire, and be invested with the same power over the child as the father himself possessed.

We have already shown that his power over the child ceased at his death, unless in his lifetime he had lawfully bound it as an apprentice to another.

In this State a "minor can be bound as an apprentice" by his father, or if none, by his guardian, or if neither father nor guardian, by his mother with the consent entered of record of the County Court of the county in which the minor resides, or without such consent if the minor being fourteen years of age, agree in writing to be so bound; or if such minor be found begging in such county, or is likely to become chargeable thereto,"—*and in no other way.* (Sec. 1, chap 81, Code W. Va.)

It is not pretended that Nicholas Neider, with the consent of the County Court of Ohio county, entered of record, bound the infant child, Agnes Neider, to The Children's Home as an apprentice, nor that it was so bound by said County Court as one found begging in said county, and likely to become chargeable thereto.

By the article of agreement made between the father and the "Home" he surrendered to it his infant child, aged

eleven months and sixteen days, and relinquished forever all power and control over it, and invested the "Home" with as full power and control over the child as he had theretofore possessed, and the "Home" in consideration thereof covenanted to receive the child and provide for her maintenance, protection and education in accordance with the provisions of the act of the legislature passed March 3d, 1870.

If we admit for the sake of the argument that the "Home" had the legal capacity to take an apprentice (on which we express no opinion), yet it is very clear, that the agreement made by the father with the "Home," as an indenture of apprenticeship, is absolutely void, because entered into without the consent entered of record of the County Court of Ohio county.

For the same reason the indenture between the "Home" and respondent, whereby he claims the infant was bound to him until she becomes eighteen years of age is also void, and therefore conferred no right upon him to retain the child against the clear legal right of the mother to have the custody of the child and the care of her education, after the father's death.

This right of the father or mother to the custody of their infant child is not an absolute right to be accorded to either of them under all circumstances. While the statute declares the right to be in the father if living, and if he be dead, in the mother; yet in both cases it is limited and qualified by the words "if fit for the trust." Recognizing this natural right of the parents, the statute is not unmindful of the rights and welfare of the child.

It has the natural right to the care and nurture of its parents, and also the protection of the court against such misfortunes of its parents, or the influences of such gross and immoral practices in their lives as will seriously imperil the life, health, morals or personal safety of the child. What measure of wickedness or profligacy on the part of the parent would be sufficient to warrant the court in depriving him of his natural right to the custody of his minor, we are not called upon to determine.

It is very certain that in such a case the specific facts relied on to warrant the court in depriving the parent of this
96

natural right would have to be distinctly alleged and clearly proved.

The fact stated in the return, that "the respondent having no children of his own he regards the child, Agnes Neider, with the same attachment and affection as he would a child of his own," or even additional facts such as,—that he is able to rear it more indulgently, educate it more highly and provide for its future more abundantly than its mother, are unworthy of consideration when weighed against the clear legal and natural right of a mother, however poor and friendless, to the custody of the person of her infant child.

In the case in judgment nothing is alleged in the return to the detriment of the petitioner's past life, present condition or future prospects, to warrant the court, for the sake of some imaginary benefit to the child, to withhold from her her natural and legal right to the custody of its person and the care of its education.

It is true, that the return shows by way of *recital*, that at the time her child was given by its father to "The Children's Home" she was so unfortunate as to be insane and an inmate of the hospital for the insane at Weston, but it is not alleged even indirectly, that she is not now perfectly restored to mental and physical health, or that there is the slightest reason to apprehend, that her malady will ever return.

This is a fact so material to the correct determination of this controversy, and so deeply involving the happiness, and it may be the life of the child, and withal so easy to be established, that it should not be permitted to remain in doubt.

If, however, the petitioner has been perfectly restored to health, and the court because of her former affliction alone, should deny her the comfort of the society of her child, then indeed would its judgment declare her misfortune a crime, and inflict upon her a punishment as bitter as death.

We are therefore of opinion, that the authority of the father to dispose of the custody of his infant child in any other manner than by lawfully binding him as an apprentice, or appointing for him a testamentary guardian, ceases at the time of his death ; that he can not by any agreement,

in writing or otherwise, relinquish the custody of the person of his infant child for any longer period than his own lifetime, so as to deprive the mother of the child, of the custody of its person and the care of its education after his death; that the agreement entered into between Nicholas Neider and "The Children's Home" relinquishing to it the custody of the child did not deprive the petitioner of her right to the custody after its father's death; that the article of agreement between "The Home" and respondent whereby it pretended to bind said child to him is void and conferred upon him no right to detain the custody of the child from the petitioner after the death of the father, and unless she be shown to be unfit for the trust the petitioner is entitled to the custody of the child.

The motion of the petitioner, that the infant, Agnes Neider, be delivered to her was in effect a motion to discharge the prisoner from custody. This was a proper mode to test the sufficiency of the return in law, and was in effect a demurrer thereto, for on such motion the return is conceded to be true. (Hurd on Habeas Corpus, 200.)

In this State the court is not precluded by the return from inquiring into the truth of the matters therein alleged, for by sec. 6 of chap. 111 of the Code W. Va., the court or judge is required to hear the "matter both upon the return and any other evidence," and discharge or remand the person into custody, or admit him to bail as may be proper. (*Rust* v. *Vanvacter*, 9 W. Va. 600.)

While less certainty is required in returns to writs of *habeas corpus* than in pleadings in civil actions, yet "certainty to a certain intent in general," is required in the return, and the facts necessary to warrant the detention of the party must in substance be alleged, so as to apprise the opposite party of what is intended to be proved, in order to give him an opportunity to answer or traverse it, and these facts ought not to appear by way of recitals only. (2 Dong. R. 150; Hurd on Habeas Corpus, 255, 257.)

The case in judgment was heard and disposed of on the petitioner's motion to discharge the child from custody, on the petition and return alone.

The statement in the petition which is the foundation of the

petitioner's right to the custody of the child, "that its father is dead" not having been traversed by the return must be taken as true, and is an admission of her *prima facie* right to the custody of the child. The burden was upon the respondent to aver, and if denied, to establish, the facts to warrant the detention of the child. We have already seen that his right to the custody of the child expired at the death of its father, and that this right instantly devolved on the petitioner as its mother unless it should be made to appear that she was "unfit for the trust."

But although the father may be dead, and the respondent have no legal right to the custody of the child, yet if the petitioner be in fact insane, or there be reasonable grounds to believe that she is insane, or liable to become so, she would be unfit to have the custody of the person, or the care of the education of the child, and however painful, it would be the duty of the court to deny the prayer of her petition.

It is not distinctly averred in the return that the petitioner at the time of suing out the writ, or at any time since, was insane.

If this recital is to be treated as a distinct allegation that she was insane, and the same is to be held as admitted to be true, then the judgment of the Circuit Court was clearly right.

But where it is apparent from the record that proof of an existing fact essential to a correct determination of the controversy has been omitted, and that without such proof, the court can never be satisfied that its conclusions are correct, and that this proof is within the reach of the parties; and the condition of the pleadings will permit the same to be done without injury to the opposite party, the court will be warranted in delaying the hearing of the cause until the parties have an oportunity of supplying proof of such material fact.

We are therefore of opinion that concerning a matter so essential to a correct determination of this controversy, as the sanity and insanity of the petitioner or unfitness in these respects, further inquiry should be made, and that the respondent should, if he so desires, have leave to amend his return, and the petitioner to make such answer thereto as

they may be advised is proper to enable the court to determine the rights of the parties in the premises.

For the reasons hereinbefore stated, the judgment of the Circuit Court must be reversed with costs to the plaintiff in error, and the cause remanded for further proceedings according to the principles settled in this opinion, and further according to law.

REVERSED.   REMANDED.