207 S.E.2d 129 (1973)
In the Matter of Ronald Lee WILLIS.
No. 13379.
Supreme Court of Appeals of West Virginia.
Submitted October 9, 1973.
Decided December 11, 1973.
Dissenting Opinion July 29, 1974.
*131 Daniel F. Hedges, Charleston, for Willis.
Chauncey H. Browning, Jr., Atty. Gen., Phillip D. Gaujot, Asst. Atty. Gen., Charleston, for State.
*130 HADEN, Justice:
This is an appeal by John and Rosetta Willis, husband and wife, from a judgment of the Juvenile Court of Fayette County of November 22, 1972 which, upon a finding of neglect terminated their parental rights in their infant child, Ronald Lee Willis, and awarded the legal custody of the child to the West Virginia Department of Welfare, with full power and authority in the department to consent to his adoption.
The State first commenced action in this case on December 23, 1968 upon the filing of an unsworn petition by Regina Hardin, a social worker with the welfare department, which alleged that all five minor children of the Willises were "neglected" as defined by the laws of the State. The petition contained no factual allegations supporting "neglect" but merely conclusional words that such children were neglected. According to the testimony of a co-worker of Regina Hardin given in subsequent proceedings almost four years after the filing of the initial petition, the apparent reasons for the action of the welfare department at that time were the extremely unsanitary and substandard living conditions to be found in the Willis home and the poor physical appearance and condition of the minor children living there.
On December 23, 1968, the Juvenile Court of Fayette County entered an order transferring *132 the custody of the children to the welfare department on a temporary basis. The action of the court was taken without notice to the parents, and in that the order stated a hearing was "pending," it is indicated that further judicial action was contemplated. Pursuant to the direction of the court, the welfare department, accompanied by a deputy sheriff of Fayette County, assumed custody of the Willis Children on December 28, 1968.
Within several months after the temporary custody change was accomplished, the four older Willis children then ranging in age from four to fourteen years were, at their request, restored to their parents. Ronald Lee, however, was not returned; he had been placed with foster parents shortly after his custody was removed from his natural parents. He has since resided with the foster parents continuously from the date of placement by the welfare department to the present. Considering his age to have been approximately eight months at the time of the initial placement and now to be approximately five and one-half years, he has lived for almost the total of his short life with the foster parents.
From the date of the initial State action in December of 1968 until a court hearing some three years later, John Willis, the natural father of the infant, made repeated informal requests and attempts to regain custody of Ronald Lee, and also to comply with the suggestions and directions of the welfare department to remedy the conditions existing at the home which had apparently precipitated the initial removal of the Willis children.
It was not until February 3, 1972 that further legal proceedings were instituted concerning Ronald Lee's custody. On that date a second petition was filed with the juvenile court by Bruce L. Webb, also a social worker with the department, alleging Ronald Lee Willis to be a neglected child, and alleging as factual grounds constituting neglect, that the child "has resided with his foster parents for approximately three years; all efforts to improve the natural parents' condition for return have failed; the natural parents' slow mentality also prohibits the child's return to them."
A hearing was held on that petition on February 15, 1972, at which time both parents were present and represented by counsel, and the petitioner Webb was present and represented by the county prosecutor. Although no transcript or record was taken of that proceeding, an order was entered on the day following the hearing by the juvenile court finding the child to be neglected and permanently awarding his custody, care and control to the welfare department with "the right to said Department to consent to the said infant's adoption." The findings and judgment of the court were excepted to by the parents.
Subsequent to the court's order of February 16, 1972, the appellants' counsel informed the social worker Webb, that his clients intended to seek a review of the court's order and requested that Webb, on behalf of the welfare department, notify appellants if further proceedings were contemplated with respect to the infant Ronald Lee. Webb acknowledged such a conversation did occur and that he had agreed to notify the appellants of any change of position by the department in respect to Ronald Lee's custody, but also, he had been assured he would be contacted later by the appellants or their counsel and he was not so contacted. In any event, on April 26, 1972, Webb participated in an adoption proceeding before the same juvenile court in which the child Ronald Lee was permitted to be adopted by the foster parents with whom he had been previously placed by the department. All such proceedings were had and concluded without notifying the Willises.
On May 2, 1972, John Willis the father, through counsel, requested a rehearing upon the validity of the final order of February 16, assailing the order as invalid because the Willises received inadequate notice of the hearing. The petition also was attacked as insufficient in law, challenged hearsay evidence was admitted and considered *133 by the court and the evidence established by proof at the hearing was insufficient in law to constitute neglect. On May 12, 1972, the juvenile court entertained the appellants' motion for rehearing, and as reflected by an order entered August 21, 1972, the court voided the decree of February 16, 1972. It is to be noted that the rather sketchy transcript recounting the proceedings of February 15, 1972 does not reflect that service of notice was had upon the appellants prior to that hearing, nor does any record reflect an affirmative waiver of notice on the part of the appellants.
On August 25, 1972, the court reconsidered its previous order of August 21, 1972 and vacated it for the reason that the petition of February 3, 1972 failed to set forth allegations sufficient to meet the minimum requirements of West Virginia Code, Chapter 49, Article 6, Section 1, as amended. The court also accorded the Willises a "rehearing" on the matters adjudicated in the February 16 decree. Although this court action took place on August 25, an order reflecting this and other proceedings was not entered until October 6, 1972 after the conclusion of all testimony in a neglect proceeding reheld in September 1972.
It further appears from the corrective order of October 6 either a "rehearing" or an entirely new proceeding commenced on August 25 at the instance of the welfare department, the final object of which was to seek a court decree declaring Ronald Lee Willis to be a neglected child, to terminate the parental rights of the appellants and to gain authority for the welfare department to consent to the child's adoption. All parties were present and were generally aware of the purport and intent of the proceedings. Counsel for the appellants waived formal notice of the proceeding on behalf of his clients as to matters contained in a handwritten petition apparently prepared coincident with the convening of the hearing. On that date the court was notified the department also intended to prove John Willis' unfitness as a parent by offering evidence of his intoxication at various times over the previous years. Appellants' counsel objected on the basis of surprise. The juvenile court informally ruled the department could amend its petition so as to enable it to adduce proof on the intoxication issue and other matters relating to the appellants' fitness and to conditions in the home. Appellants were also given opportunity for a continuance to meet the new matters asserted by the welfare department, and hearings in the case actually did not begin until September 7, and were not concluded until September 29, 1972.
On November 22, 1972, the transcript reflects the filing or entry of three documents. First, an order was entered permitting the State to present evidence on the issue of intoxication; second, filing the "new" or "amended" juvenile petition which recited inter alia on the complaint of Bruce L. Webb, social service worker with the department of welfare, that:
"Ronald Lee Willis is an infant four years of age; that the said infant lives and resides with his foster parents (now adoptive parents) Buford and Roxie Blevins.
"Your petitioner would further show unto your Honor that the said infant aforementioned as of about the 3 day of February, 1972, had resided with said foster parents for about three years; that prior thereto had lived with his natural parents, Mr. and Mrs. John F. Willis in Fayette County, in a house not fit or suitable for human occupancy; said parents' home was frequently without proper heat in cold weather, also in a dirty and filthy condition; said child was kept dirty; said home was in disrepair; and said child was not given care and supervision adequate for his physical, emotional or social needs and with the result that the future welfare and well being of said child were seriously endangered. The father, John F. Willis, drank intoxicants frequently and excessively and became intoxicated in the presence of his children."
*134 This petition was signed and verified on the 30th day of October, 1972.
The concluding entry on November 22, 1972 was the final order of the juvenile court decreeing in accordance with the prayer of the petition that:
". . . Ronald Lee Willis under the evidence introduced in the hearings in this matter is and the court finds him to be a neglected child.
"It is further ORDERED, ADJUDGED AND DECREED that the care, custody and control of Ronald Lee Willis is permanently removed from his natural father and mother, John Willis and Rosetta Mary Neal Willis.
"The court being of the opinion that it is necessary for the welfare of the child does terminate the parental rights and responsibilities of the child's parents and the permanent care, custody and control of Ronald Lee Willis is granted and awarded to the State Department of Welfare and the State Department of Welfare shall have the right to give consent to the adoption of Ronald Lee Willis."
This order was entered without notice to appellants or their counsel.
The foregoing represents our best efforts to recount the legal proceedings which resulted in the final order appealed from. Inasmuch as orders were entered recounting and ratifying events which occurred considerably prior to their reflection in the official record, it is hoped the preceding account accurately reflects the chronology of procedures employed in the Juvenile Court of Fayette County.
Parenthetically, it also should be noted that the adoption proceedings of the infant Ronald Lee Willis concluded on April 26, 1972, are the subject of a separate revocation proceeding by the appellants herein against the department of welfare and Buford and Roxie Blevins, the adoptive parents. The adoption proceeding remains on the docket of the Juvenile Court of Fayette County pending the outcome of this appeal.
All the evidence which is before this Court was taken at the two hearings of September 7 and September 29, 1972.
From the testimony given by Nellie MacMillion, a welfare department social worker, it affirmatively appears that from sometime in 1966 to a period in 1969, within a few months after the initial taking of the Willis children from their natural parents, the living conditions in the home were severely substandard. During her visits to the home she found that there was a strong odor in the house; the family used the area around the house for their bodily functions; there was human excreta in the house; and cooking utensils were filthy. As to the physical structure of the house, the only heating unit, a stove, was propped up with bricks and rocks; there were no bathroom facilities; the kitchen facilities were such that it was impossible to prepare complete meals; there were only two bedrooms in the house. There were twelve persons occupying the house in December of 1968. Found in that environment, Ronald Lee, the disputed infant, appeared anemic, underdeveloped and undernourished as well as being physically dirty. Additionally, the witness testified she had observed a number of partially-filled wine bottles in the home and, on one occasion during that time period, she had observed Mr. Willis in an intoxicated state in the county jail. Based upon those things it was her opinion the care of all the Willis children was inadequate.
In her later testimony on cross-examination, Mrs. MacMillion said that she had no personal knowledge of what had occurred in relation to the Willis family or the home living conditions since her last visit early in 1969. She also stated she had been unsuccessful in locating new living quarters for the Willis family although she attempted to assist them in upgrading their living conditions, and acknowledged that the visiting homemaking services extended by the department of welfare to dependent families were not utilized in this instance since no such service was available in Fayette County.
*135 For the period from March 1970 until February of 1972, Bruce Webb, the social worker most recently assigned to this family, also gave corroborating testimony in regard to the living conditions in the home. He observed the Willis children who had returned to the home as being unkempt and dirty and stated the home condition had remained generally unsatisfactory. He related one incident in November 1971 at a time when the outside weather was cold and wintry and said the inside of the home was so cold that he and Mrs. Willis, though warmly dressed, were shivering because the home was in such a state of disrepair that it was virtually open to inclement weather conditions. Webb also opined that the children at home did not have proper discipline but admitted that none were in any type of difficulties outside the home. It was his further opinion that both parents lacked the ability to accept their parental responsibilities. Webb also corroborated previous testimony to the effect that he had once seen John Willis in an intoxicated state in the presence of some of his children. He also offered his opinion that, because of Ronald Lee's age when he left the home and considering the long separation, he felt a return to his natural parents would have a detrimental effect upon his future welfare.
On the other hand, his testimony was also to the effect that the parents were happy to have the children back in their custody and had made repeated attempts to secure Ronald Lee's return. Mr. Willis, according to Webb, had made twenty to twenty-five contacts with him during the 1970-1972 period for the purposes of expressing his concern for the return of Ronald Lee and finding new housing, an apparent precondition the department placed on Ronald Lee's return. Further, the Willis family had never refused any of the services offered to them by Webb and the welfare department, and Webb did not consider the children in the home to be physically abused.
Two school attendance officers testified for the State that they had had serious truancy problems with some of the Willis children in earlier years, but that in 1971 the school attendance by these children had been better than usual and that the most any of the children had missed in that year was seventeen days. Additionally, none of the children in the custody of the appellants had missed any school during the 1972 school year.
T. E. Myles, an attorney from Fayetteville who represented the foster parents, stated he offered Mr. Willis two or three hundred dollars to compensate or reimburse him for Ronald Lee's birth expenses and, contemporaneously, had asked both parents to sign a relinquishment and consent to adopt. Mr. Willis refused the offer of money and refused to sign any documents, telling Myles he believed there was hope of securing the return of his child.
The appellants offered testimony from four witnesses. Mary McNab, a former caseworker with the department of welfare in Washington, D. C., visited the Willis home on two occasions immediately prior to the September 1972 hearings. In addition, she conducted interviews with some fifteen neighbors and school officials who had contact with the Willis family. She offered testimony concerning her personal observations and gave opinion evidence in her capacity as a trained caseworker. On her visits to the home she found it to be in good repair, clean and neat, with linoleum on the livingroom floor and the rooms, though poorly furnished, appeared to be adequate to serve the family's needs. She also stated there was water in the house and the family then had an electric pump for the water, and other plumbing facilities.
She stated she found the children expressed affection for one another and cared a great deal for their parents and she saw no indication of child abuse. Health records at the school corroborated the children's general good physical health. It was her concluding opinion that the family could and would properly care for the infant Ronald Lee if he were returned to his parents.
*136 James Sommerville, a Presbyterian minister, visited the Willis home at the request of the Welfare Rights Organization for the stated purpose of giving testimony in this case and, also, to volunteer to help Mr. Willis with some home repairs. From his personal observation he found the home to be neat and clean and found no repairs to be necessary. Both Mary McNab and James Sommerville acknowledged on cross-examination that their visits to the Willis home were expected by the Willis family, but both said that the Willises did not know when they were going to drop in on them.
Annie Kelly, a sister of John Willis who also lived in Fayette County, testified she had visited the Willises at least once a month over the previous years; the present home was typical of other substandard rural homes in the area, and that Mrs. Willis kept the home clean and cooked good simple meals for the family. She stated, in her opinion, the Willises loved their children, took care of them to the best of their ability and did not abuse them. It was her further opinion the children loved their parents and all the children were in good health. She stated the Willises were on good terms with their neighbors. Further, as to the living conditions in the home they now had a Warm Morning heater in the livingroom and an electric stove in the kitchen.
John Willis testified that he had no notice nor was he served with any type of papers when the children were initially taken from him some four years previous. He testified generally that, though he had attempted to do everything the welfare department requested of him, they had not helped him get better living quarters and had refused to return Ronald Lee to the family despite his repeated requests to have Ronald Lee returned.
As to the condition of the present home, Willis said he had repainted the inside of the house, put in a bathroom, and was in the process of adding an additional room. Mr. Willis offered no testimony to rebut charges concerning his drinking habits.
The principal and underlying issue in this case is whether the State offered sufficient proof of unfitness of the natural parents of Ronald Lee Willis to warrant a permanent change of custody for the child, and whether such child is neglected within the meaning of the statutes and case law?
Before arriving at consideration of the foregoing issue, we must assess the validity and legal effect of the initial taking of the infant child from its natural parents and of all proceedings had prior to the final hearing which began in September of 1972.
A principal contention of the State, in support of the correctness of the final order, is that the welfare of the child commanded the Juvenile Court of Fayette County to have given utmost consideration to the fact that the child had resided with his foster parents for most of his life. The appellants, on the other hand, say that the initial taking of the child, resulting in his prolonged absence from his natural parents, was illegally and unconstitutionally accomplished. This Court cannot ignore this assertion in the disposition of this case.
In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person. State ex rel. Acton v. Flowers, Comm'r, 154 W.Va. 209, 174 S.E.2d 742 (1970); State ex rel. Kiger v. Hancock, 153 W.Va. 404, 168 S.E.2d 798 (1969). The Supreme Court of the United States has recognized the right to raise one's children is a fundamental personal liberty guaranteed by the Due Process clause of the Fourteenth Amendment. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). In that decision, Mr. Justice White cited, with approval, the language of Mr. Justice Frankfurter in an earlier concurrence:
"It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made *137 to liberties which derive merely from shifting economic arrangements.' Kovacs v. Cooper, 336 U.S. 77, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513, 527, 10 A.L.R.2d 608 (1949)."
We hasten to affirm that Article III, Section 10 of the West Virginia Constitution in equal measure protects this fundamental right of parenthood. See In re: Simmons Children, 154 W.Va. 491, 177 S.E.2d 19 (1970).
The preeminent right of the parent to the custody of his child has been recognized in the statutes of this State since its formation. Code 1931, 44-10-7, as amended, provides inter alia:
". . . But the father or mother of any minor child or children shall be entitled to the custody of the person of such child or children, and to the care of his or their education. . . ."
Nevertheless, this Court, early in the history of this State, recognized that the right of the natural parent to the custody of his child is not absolute; it is limited and qualified by the fitness of the parent to honor the trust of the guardianship and custody of the child. See State ex rel. Neider v. Reuff, 29 W.Va. 751, 761, 2 S.E. 801 (1887). Standing at the side of the natural parents with benign, but continuing, interest is the State. The doctrine of parens patriae, subsisting since feudal times and well documented in the common law of England, Virginia, and this State, accords the State rights just below that of the natural parent in the health and welfare of minor children. For the protection of the child, the State has always moved expeditiously and decisively when a natural parent has been proved to be unfit to continue the trust of raising his child, when a child has been abandoned by his natural parent or when the parent, by agreement or otherwise, has permanently transferred, relinquished or surrendered the custody of such natural child. See State ex rel. Cash v. Lively, W.Va., 187 S.E.2d 601 (1972); State ex rel. Kiger v. Hancock, 153 W.Va. 404, 168 S.E.2d 798 (1970); Whiteman v. Robinson, 145 W.Va. 685, 116 S.E.2d 691 (1960); Hoy v. Dooley, 144 W.Va. 64, 105 S.E.2d 877 (1958).
Our statutes providing for the welfare of children establish a mechanism whereby the courts may adjudicate questions arising when the State or a citizen thereof believes there is necessity to change the custodial relationship of natural parent and child because of some dereliction on the part of the parent or the child. Chapter 49 of the Code of 1931, as amended, is the legislative declaration of the State's interest, responsibilities and rights as respects any minor child under the age of eighteen years, who for some reason specified by the statute is in need of services, protection or care. See Code 1931, 49-1-2, as amended. The statute also recognizes that children may be neglected, and defines a neglected child in Section 3 thereof.
The procedure to be followed when an arm of the State or one of its citizens believes neglect of a minor child to have occurred, is to be found in Article 6 of Chapter 49. Section 1 provides:
"If the State department, [of welfare] or a reputable person, believes that a child is neglected, the department or the person may present a petition setting forth the facts to the juvenile court in the county in which the child resides, or to the judge of such court in vacation. The petition shall be verified by the oath of some credible person having knowledge of the facts. Upon the filing of the petition, the court or judge shall set a time and place for a hearing."
Recognizing the rights of a natural parent to the care, custody, and companionship of his natural child rise to a constitutional level and judicial proceedings affecting such rights must be conducted with regularity and fairness, this Court in a case concerning the alleged neglect of children, recently held:
"Although the hearings in a juvenile court are not usually held to the same *138 strict rules of procedure as ordinary cases, the basic requirement of the law as to due process must be followed for a proper hearing to be held." Syllabus, Point 1, In re: Simmons Children, supra.

One of the basic constitutional guarantees of due process is, of course, that no one shall be deprived of a substantial right by an arm of the State without notice and the opportunity to be heard in a meaningful manner. See State ex rel. Payne v. Walden, W.Va., 190 S.E.2d 770 (1972). Code 1931, 49-6-2, as amended, recognizes and accords the right of notice and the opportunity to be heard to the parents of a child whose custody is sought to be taken by the state department of welfare or another person because of neglect. The case of In re: Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966), established the principle that fundamental due process requires the notice of an adjudicatory hearing to the parties affected in a juvenile proceeding. Well before Gault was decided, however, this Court held in the case of In re: Sutton, 132 W.Va. 875, 53 S.E.2d 839 (1949), a parent could not be divested of his parental rights without notice and opportunity for a hearing when such parent was subject to the jurisdiction of the court and available for service of process; and any such hearing held divesting the parent of his rights to his child resulting in a decree, was void and of no effect. This is the undoubted law in this jurisdiction and elsewhere, mandated by our own as well as the Federal Constitution, and it operates to prevent the permanent termination of parental rights without according the full range of due process guarantees to the affected persons.
Nevertheless, there are situations of an emergency nature which can and do arise demanding the State as parens patriae and acting in loco parentis, to move immediately without regard to the rights and sensibilities of the parents in order to protect the health, welfare and sometimes the very life of a child who needs care and protection. Again, our statute so provides. Code 1931, 49-6-3, as amended, reads:
"Until a hearing can be held upon the petition, the court or judge may order that the child be delivered into the custody of a county department, or into such other custody as the court or judge may deem proper."
Until now, this section of the statute has never been construed. It would appear the welfare department availed itself of the provisions of this section to accomplish the taking of the Willis children in December of 1968. Recently, this Court was faced with an analogous situation, coincidentally involving the department of welfare, which involved the claimed entitlement or privilege of one to do business with the State. In the case of State ex rel. Bowen v. Flowers, Comm'r, W.Va., 184 S.E.2d 611 (1971), based upon an investigation, the welfare department suspended a pharmacist from participation in medical programs administered by the department, and did not permit him to continue selling drugs to the State while under civil and criminal investigation. The commissioner suspended the pharmacist without first granting him opportunity to be heard. The Court recognized the legitimate State interest in purchasing and supplying pharmaceuticals to persons eligible for the medical assistance programs administered by the department of welfare and held this principle to be of overriding and compelling State interest. As such it warranted the temporary abrogation of an individual's right to due process:
"The opportunity to be heard is a fundamental requirement of the due process clause of the federal and state constitutions. However, where there is an overriding public interest involved the hearing may be postponed for a reasonable period of time in order to allow an investigation to be conducted." Syllabus, Point 1, State ex rel. Bowen v. Flowers, Comm'r, supra.

*139 It then became necessary for the Court also to define a "reasonable period of time" and it held:
"In a case where a temporary suspension prior to a hearing pending an investigation is justified, the length of the suspension in order to conduct the investigation depends on the needs and circumstances of the individual case." Syllabus, Point 2, State ex rel. Bowen v. Flowers, Comm'r, Id.

Then, appraising the facts in that particular case, the Court held the suspension of the pharmacist's entitlement for a period of four months without opportunity for a hearing, and considering that an investigation had been continuing for a period of seven months, was an unreasonable length of time. Consequently, the commissioner was subject to the award of a rule in mandamus against him, in that his failure to accord the hearing for the period of time involved constituted an arbitrary and capricious action on his part.
Returning to the facts of the case at hand, we assume there was good and sufficient reason for the lodging of a petition by a welfare department official in December of 1968 against John and Rosetta Willis in order to effect an immediate change of the custody of their minor children. Arguendo, we further assume emergency circumstances warranted an immediate taking, without notice to the parents or opportunity for them to be heard. However, we must pass upon whether the department then had the right to retain the custody of Ronald Lee and to pass his custody on to strangers while withholding from his natural parents the opportunity for a meaningful hearing for a period of more than three years.
In a very similar child custody case involving a dispute between a natural parent and the department of welfare in the Commonwealth of Massachusetts, a three-judge federal district court in White v. Minter, 330 F.Supp. 1194 (D.C.Mass.1971), had occasion to pass upon this specific question. That court held the retention of an allegedly abandoned child away from its natural mother without extending the right of hearing to the mother for a six-months' period of time, was an unconstitutional application of a statute (similar in language to Code 1931, 49-6-3 as amended) which otherwise permitted a temporary custody change in an emergency. The court also approved language from the case of United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) wherein the Supreme Court held a statute setting forth no guidelines for a "reasonable time" as meaning that time "reasonably requiring administrative and judicial action within time limits that would meet constitutional demands." Id, 330 F.Supp. at page 1198. In other words, a reasonable time would be an unspecific time, rather short in duration, necessarily required to effectuate the overriding state interest.
We believe the principles enunciated and implied in the cases of State ex rel. Bowen v. Flowers, Comm'r, supra, and White v. Minter, supra, are applicable to the case at hand. Under the principle of parens patriae we acknowledge the State has an overriding interest in the health and welfare of any allegedly neglected child within its jurisdiction who is in apparent need of immediate care. On the other hand, we will not say the retention of custody of a child and the deprivation of companionship of the child from his natural parents for a period of three years, without notice and without a hearing to the persons affected, is sanctioned, by any stretch of the imagination, by the "overriding State interest" principle. Any taking and holding of a child from the custody of its natural parents is an unwarranted and unjustified intrusion by the State into the very personal family relationship, if it continues beyond any period necessary to serve the legitimate interest of government to protect the health and welfare of the minor child. The holding of the child in legal limbo away from his family and in disregard of their rights, without adjudication of these rights, *140 offends due process and subverts the associative benefits of the familial relationship which natural law has honored since ancient time and which the Constitution protects today. See Stanley v. Illinois, supra; In re: Gault, supra; Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1965); In re: Simmons Children, supra; Accord, Kennedy v. Meara, 127 Ga. 68, 56 S.E. 243 (1906). Both this Court and the Constitution are offended by the timespan of the retention of the infant child Ronald Lee Willis in obvious disregard of his parents' rights, his rights, and his consequent future welfare. We hold, therefore, the initial custody change of Ronald Lee from his natural parents to the department of welfare, though presumptively legal at its inception, to have become, by the mere passage of time coupled with the omissions of the State to accord due process to the natural parents, void ab initio and of no effect.
As respects the abortive legal proceeding held in February of 1972 purporting to terminate the parental rights of the appellants and transferring permanent custody to the department of welfare, and reposing authority in it to consent to the adoption of Ronald Lee Willis, the Juvenile Court of Fayette County upon reconsideration saw fit to set aside its ruling of February 16, 1972, we see no reason to disturb that ruling. There is ample authority in the case of In re: Simmons Children, supra, to support the legal conclusion of the court in the vacation of its former order. Syllabus, Point 2 of that case held:
"The petition to the juvenile court in cases involving neglected children should set forth the facts constituting the neglect and not merely state conclusions in connection therewith."
This principle, as well as those involving adequate notice to the parties and the exclusion of hearsay evidence, is directly applicable to the proceedings had in February of 1972.
Accordingly, we come to the main issue with a view that valid legal proceedings occurred in this case, if at all, within a time frame between August 25, 1972 and November 22, 1972. On the former date, regular juvenile proceedings were convened by the court. All parties were present with counsel and waived any defects as to notice of the scope of the hearing.
In assessing the allegations of the petition and the evidence taken in the proceeding, this Court is guided by relatively settled principles. First, a petition in a proceeding involving custody of an infant is addressed to the sound discretion of the juvenile court. Green v. Campbell, 35 W.Va. 698, 14 S.E. 212 (1891); Armstrong v. Stone, 9 Gratt. (50 Va.) 102 (1852); Coffee v. Black, 82 Va. 567 (1866). See also, 14 M.J., Parent and Child § 8 (1951). The juvenile court is authorized to exercise a discretion conducive to the best interest of the child. Hammond v. Department of Public Assistance, 142 W.Va. 208, 95 S.E.2d 345 (1956). Second, even in a case where the State, acting by and through the authorization of the legislature in delegation to the department of welfare, properly seeks to interpose and substitute itself to the rights of natural parents to an allegedly neglected child, the basic presumption applies: "The right of a natural parent to the custody of his or her infant child is paramount to the right of any other person." State ex rel. Acton v. Flowers, Comm'r, supra. Third, the right of the natural parent is not absolute and may be limited or terminated by the State if the parent is proved to be unfit to retain the trust of child care. State ex rel. Neider v. Reuff, supra. Fourth in order to separate a child from its parents on the ground of their unfitness, there must be clear, cogent and convincing proof. In re: Simmons Children, supra; Whiteman v. Robinson, supra. Fifth, each case turning on the unfitness of the natural parent must be decided on its own particular facts. Pierce v. Jeffries, 103 W.Va. 410, 137 S.E. 651 (1927). Sixth, once a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his *141 natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody. Even then, the legal rights of the parents, being founded in nature and wisdom, will be respected unless they have been transferred or abandoned. Cunningham v. Barnes, 37 W.Va. 746, 17 S.E. 308 (1893); State v. Joplin, 131 W.Va. 302, 47 S.E.2d 221 (1948). The statutory scope of the juvenile court's discretion in making the award of custody, found in Code 1931, 49-6-5, as amended, is consistent with the common law of this State and the principle just exposited. Seventh, on this review, this Court is also guided by the principle that findings of fact of the juvenile court, in the exercise of its equity jurisdiction, will not be disturbed on appeal unless at variance with undisputed evidence or contrary to the plain preponderance of the whole evidence. See, Wade v. Wade, 115 W.Va. 132, 174 S.E. 787 (1934).
Applying the foregoing principles and assessing the evidence adduced by the parties, we are led inexorably to the conclusion that this case must be reversed and the child, Ronald Lee Willis, must be restored to the custody of his natural parents. Viewing the evidence of the State in the best light possible, it is strongly indicative of child neglect and less than proper parental care for a period from 1966 to December of 1968. From that point forward until late 1971, the evidence less strongly, though certainly affirmatively, indicates an unawareness on the part of the parents of their own personal needs as well as the State-recognized needs of the children. The rather dismal home conditions which prevailed during that period certainly cannot be ignored by this Court, nor were they ignored by the juvenile court.
On the other hand, there is strong evidence from the State's own witnesses as well as the witnesses for the appellants, that the natural parents were quite willing to accept all the help the department of welfare was willing to extend to them. That they and their children living at home with them, loved and cared for one another and that the father, though with repeated unsuccessful efforts, never gave up on attempts to resecure the custody of his infant child, Ronald Lee Willis. The evidence adduced on behalf of the appellants is strongly indicative of rehabilitative efforts to enhance the living conditions in the home and to effect repairs and restoration of the physical aspects of the residence in such a manner as to make it a more fit place within which sanitary and comfortable cohabitation could occur.
In summary, the best evidence of the department of welfare is remote and, unfortunately for the State, irrelevant to the conditions existing in the critical period just prior to the autumn of 1972, when the court was called upon to reassess in a valid and meaningful manner, relevant and pertinent evidence on the issues of neglect and unfitness of the parents. In point of time the evidence of the State, otherwise unrefuted, establishing the transgressions of apathetic parenthood, is certainly insufficient when assessed in light of the recent and favorable evidence showing the parents' efforts and successes toward improvement of the family environment and the physical living conditions in the home.
The conduct of the older Willis children living at the home must also be given consideration. It must be recalled that the children returned of their own volition to their parents' home in early 1969 and that the only evidence given in relation to them demonstrated strong ties of affection within the family and revealed they were in no trouble with the law or the community; and that though their earlier school attendance had been irregular and haphazard, that recent attendance records in 1971 and in 1972 showed significant improvement. From the testimony of the school attendance officials it appeared that in the year 1972 none of the children had missed any attendance in school.
As regards the voluntary return to home by the older children, we must also give *142 some probative value to the inconsistent conduct of the welfare department in demonstrating strong concern for the youngest child's welfare while showing no concern in the older children's return to an allegedly unsuitable environment.
We cannot today in candor and fairness commend the family's living conditions or exemplify it as a typical West Virginia rural home; we cannot gloss over the unrefuted evidence of the father's intemperate drinking habits, nor can we even suggest these children will be raised in the best possible family environment from an educational, economic, or cultural standpoint.
Nevertheless, the duty on this Court has been to determine whether neglect and parental unfitness have been established by clear, cogent and convincing proof. Simply put, such proof has not been introduced. The strongest proof offered on behalf of the State was not seasonable as remote in time and, therefore, was not relevant and material. It must, of necessity, fail and the welfare department's case fails with it.
There is one further factual point which calls for a fair comment by this Court. Our decision is rendered all the more difficult because we cannot ignore the fact that Ronald Lee Willis is being restored to the custody of strangers in a strange and, for him, an unnatural environment. From the time he was eight months of age until now when he is five and one-half years old, he has been given the love, care, and companionship of the foster parents who are presumed on the evidence at hand to be fit, proper and fine people. It would be an understatement to say that it will be most difficult for them and for Ronald Lee to adjust to the change of custody. Through a tragic series of events, the State Department of Welfare is responsible for the consequences which must naturally flow from the implementation of this decision. And in that the State's custody of Ronald Lee Willis from December 1968 was never even presumptively valid until November 22, 1972, it naturally follows that the State could not consent legally to the adoption of the infant child in April of 1972.
As this Court has previously recognized in the case of Whiteman v. Robinson, supra, the law does not recognize any relationship which may produce mutual affection between a child and his temporary custodian and which leads to the annulment of the natural parents' right to the care, custody and control of the child:
"It would be a dangerous and perversive doctrine to hold that the mutual affections of the child and its temporary custodian should annul the parent's natural right to his offspring." Id., 145 W.Va. at page 696, 116 S.E.2d at page 697.
The welfare department sought to rely upon the passage of time and the ties of mutual affection which naturally arose between the foster parents and Ronald Lee Willis. Neither this Court nor the Juvenile Court of Fayette County is entitled to take legal cognizance of that custody change, and its effect upon the child. No court is warranted in applying the "polar star principle" until the natural parents' rights have been lawfully severed and terminated.
For the foregoing reasons we hold the judgment of the Juvenile Court of Fayette County to have been plainly wrong: at variance with undisputed evidence, and contrary to the plain preponderance of the whole evidence. We, therefore, reverse the judgment and remand it to the juvenile court for the entry of orders consistent with this opinion and the principles of res judicata as set forth in the case of State v. See, 145 W.Va. 322, 115 S.E.2d 144 (1960), and the holding reflected in Syllabus Point 1 thereof.
Reversed and remanded with directions.
SPROUSE, Justice (dissenting):
I respectfully dissent from the decision of my colleagues as expressed in the majority opinion. I agree in the main with that part of the discussion concerning the laws and constitutional principles as they relate to the temporary custody of an infant child in *143 cases of this nature, but I believe that this discussion is irrelevant to the proper resolution of the issue in this case. The sole issue, in my opinion, is whether the trial court properly found after the 1972 hearings that the Willises were unfit parents.
Certainly, neither a court nor the Department of Welfare can, under the guise of temporary custody, permanently remove a child from its natural parents. The "overriding state interest" principle cannot be thus abused. The discussion of the laws and constitutional principles concerning this is learned and well articulated in the majority opinion. Most certainly such temporary custody can only be for a reasonable time and the length of time "depends on the needs and circumstances of the individual case." Obviously, a retention of a child under a temporary custody order for a period of three years is too long and is violative of the due process rights of the parents. I disagree strongly, however, with the conclusion of the majority that the original action by the court awarding temporary custody is thus void ab initio. This conclusion has no bearing on the outcome of the majority decision and is an added increment not called for by the logic or rationale of the above rule. The prolonged illegal temporary custody, resulting in the unconstitutional application of an otherwise constitutional statute, is sufficient in itself to terminate the temporary retention. Code, 1931, 49-6-3, as amended, however, clearly gave the court authority to make the original award. Lifting ourselves by the boot-straps by creating the fiction that a once legal proceeding becomes void ab initio is a dangerous precedent. Such judicial overkill is not necessary for the majority disposition of the case, and may well adversely affect some future relationship between innocent third parties.
I agree with most of the well-reasoned discussion in the majority opinion of the law relating to the right of parents to custody of their children. I disagree sharply, however, with the majority's application of these legal principles to the facts of the case. I agree that: A decision involving custody of an infant is in the sound discretion of the juvenile court and that the juvenile court is authorized to exercise a discretion conducive to the best interest of the child; the right of a natural parent to the custody of his or her infant child is paramount to the rights of any other person (except the child, of course); the right of the natural parent is not absolute and may be limited or terminated by the State if the parent is proved to be unfit; in order to separate a child from its parents on the ground of their unfitness, there must be clear, cogent and convincing proof; each case of alleged unfitness of the natural parent must be decided on its own particular facts; once a determination of unfitness is made, the welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody; and finally and importantly, an appellate court reviewing a custody award made by a trial court is governed by the long established and still prevailing rule of law that the finding of fact by a juvenile court in the exercise of its equity jurisdiction will not be disturbed unless at variance with undisputed evidence or contrary to the plain preponderance of the whole evidence.
The majority opinion states: "* * * Viewing the evidence of the State in the best light possible, it is strongly indicative of child neglect and less than proper parental care for a period from 1966 to December of 1968. From that point forward until late 1971, the evidence less strongly, though certainly affirmatively, indicates an unawareness on the part of the parents of their own personal needs as well as the State-recognized needs of the children. The rather dismal home conditions which prevailed during that period certainly cannot be ignored by this Court, nor were they ignored by the juvenile court. * * *" The statement of facts is well presented in the majority opinion, but the above summary of them in applying the law is a considerable understatement.
*144 The majority expresses the view that after 1971 and until the hearing in the Fall of 1972, the home conditions and the efforts of Mr. and Mrs. Willis to become better parents improved. Importantly, the opinion goes on to say: "In summary, the best evidence of the department of welfare is remote and, unfortunately for the State, irrelevant to the conditions existing in the critical period just prior to the autumn of 1972, when the court was called upon to reassess in a valid and meaningful manner, relevant and pertinent evidence on the issues of neglect and unfitness of the parents. * * *"
The principal witness in the case, the social worker, Nellie MacMillion, who observed the family frequently during the important period between 1966 and 1969, testified that during her visits to the home she found that there was continually a strong odor in the house; that the family used the area around the house for toilet functions; there was human excreta in the house; and that the cooking utensils were filthy. The rest of her testimony was well summarized in the majority opinion: "* * As to the physical structure of the house, the only heating unit, a stove, was propped up with bricks and rocks; there were no bathroom facilities; the kitchen facilities were such that it was impossible to prepare complete meals; there were only two bedrooms in the house. There were twelve persons occupying the house in December of 1968. Found in that environment, Ronald Lee, the disputed infant, appeared anemic, underdeveloped and undernourished as well as being physically dirty. Additionally, the witness testified she had observed a number of partially-filled wine bottles in the home and, on one occasion during that time period, she had observed Mr. Willis in an intoxicated state in the county jail. * * *"
Another social worker, Bruce Webb, testified that he was assigned to the family between 1970 and 1972, and his testimony indicated that these conditions remained substantially the same during that period of time. He testified that on one visit to the home in November, 1971, when the weather was extremely cold, the house was open to the cold weather and that the occupants were suffering from the cold, although they were dressed as warmly as possible. Webb also testified about seeing the father, John Willis, intoxicated in the presence of his children. Appropriate witnesses for the State indicated a serious discipline problem with the Willis children as well as frequent absences from school during the entire period through 1971.
None of the witnesses for the State could be considered to be biased in the ordinary sense. The two most important ones were MacMillion and Webb, social workers who, excepting the parents, knew far more about the family than any witnesses involved. The testimony of the principal witnesses for the defendants, on the other hand, could have been considered suspect. John Willis, the father, neither denied nor offered any rebuttal testimony concerning his alcoholic and slovenly habits. John Willis' sister could well have been motivated by the obvious familial interest. The mother, Mrs. Willis, although having the opportunity to testify, declined to avail herself of that opportunity. Mary McNab was obtained by the parents as a purported expert witness. Her qualification was one year in social work in the neighborhood of Washington, D. C. After the defendants were alerted to her arrival, she visited them on two occasions for a total of two and one-half hours. Based on this, she made the sweeping conclusion that the Willises were fit parents. Likewise sent to the Willis home after notification to them, was witness Sommerville. He testified concerning the same home that MacMillion and Webb had described as being so deplorable. Sommerville made the somewhat startling observation that the home was "a very typical West Virginia home", and "a good place for children to be living in."
I agree with my colleagues that the proceedings of February 16 were invalid, and that the hearings of September 7, and September 29, 1972, were legal in all respects. *145 I am at a loss to understand, however, how the evidence covering the period 1966 to 1972 by MacMillion and Webb loses its probative force when it was introduced during the latter hearings simply because it had been previously introduced in an irregular proceeding. The probative value of this evidence should likewise not be reduced because the infant, Ronald Lee Willis, was too long in the temporary custody of foster parents. The evidence was perfectly valid and, in fact, uncontroverted to prove that in each of the years from 1966 through 1971 the conditions of the Willis home were intolerable for adequately rearing children and that the Willises either could not, or did not care to remedy their problems. This evidence was offered only to establish the conditions during that period. The evidence concerning the part of the year 1972 that was involved should, of course, be weighed along with the evidence relating to the previous years. The Court in its opinion did that. We cannot say that a trial court in making a difficult determination of this type is limited to observing the conditions of the home and the conduct of the parents for any one period of time. It would seem to me always to be pertinent to consider the history of home conditions. The greater evidentiary detail by which such conditions are documented, the easier should be the court's decision. To deprive the trial judge of these important tools is perhaps to force the exercise of his discretion by artificial game rules contrived by parties or their counsel.
The trial court in this case gave every indication of fairness to the natural parents. A circuit court, such as is involved here, acts as a criminal court, a domestic relations court, a juvenile court, and a court of general civil jurisdiction. The juvenile dockets are always crowded. It was the Department of Welfare's dereliction in not securing an expeditious hearing on the matter of permanent custody. The trial court recognized this, and invalidated the February 16, 1972 hearing on statutory and constitutional grounds. The court offered to suspend later hearings to permit the defendants opportunity to gather additional rebuttal evidence. The court on September 7 and September 29 heard all of the testimony offered, and on October 6 entered an order continuing the case until it had opportunity to consider the evidence. It found in a carefully drawn opinion of October 27, that the Willises were unfit parents.
It is unfortunate that the case was in litigation for such a long period of time. On the other hand, the court obviously had more opportunity than normal to observe the parties and the witnesses, as well as having the advantage of being a trial judge involved in many similar proceedings in the same locality.
In view of all of this, it seems incongruous to me that we can recognize the trial court's discretion in making this finding, restating the rule that its finding will not be disturbed unless at variance with undisputed evidence or contrary to the plain preponderance of the whole evidence, and not uphold it. In my view, the findings of the trial court are supported by clear, cogent and convincing evidence. I cannot visualize a set of circumstances less conducive to the proper welfare of a child than those reported in this case. It is trite to say perhaps, that this has nothing to do with the fact that the Willises are on welfare or are economically poor. Poverty is not a basis of finding unfavorable family conditions. Families in dire economic circumstances frequently create for themselves the warmest, most sensitive and rewarding intrafamily relationships. Who knows but what that may be the best environment in which a child can be reared. Parents of any status who so neglect their children could be deprived of their custody. Neither poverty nor opulence is an excuse for such gross neglect of children. Each case must be decided on its own facts regardless of the status of the parents.
I agree with the general statements concerning the doctrine of parens patriae and *146 the doctrine relating to the rights of natural parents to custody of their children. I disagree, however, with what I consider to be an erroneous juxtaposition of these doctrines. It is clear that natural parents have rights superior to others in the absence of clear, cogent and convincing proof that the parents are unfit or have voluntarily relinquished their rights to a child. This does not mean, however, that the rights of a natural parent are superior to the rights of the child. No principle of law would suggest that. Once a determination is made that the parent is unfit, there is not involved a question of the rights of the State as opposed to the rights of the parents, but the rights of the child as opposed to the rights of the parents or perhaps more simply, the rights of the child disregarding any residuary feelings of the parents.
Once it was demonstrated by competent evidence that the parents were unfit, there could then be considered evidence of any matter affecting the welfare of the child. It was here that the trial court properly considered the fact that the child had been in the custody of foster parents from the time he was eight months old until he was five and one-half years old. This was not necessary to sustain the finding of unfitness, nor was it made solely in that respect. Once, however, unfitness had been determined, the trial court was faced with the task of ruling on the totality of the case, including the question of custody to the Department of Welfare.
My colleagues, of course, are sensitive to this aspect of the case, and realize as readily as I the tragic possibility of the scars inflicted upon this child because of his being taken from warmth and security to possible or probable insecurity. I cannot believe that justice is served by making this kind of human impact by syllogistic reasoning as to what point of time in a proceeding evidence will be received concerning the fitness of parents or that otherwise legitimate evidence should not be received because the Department of Welfare was negligent in not timely obtaining a hearing on the question of permanent custody. I also believe that the majority opinion would overly extend the great constitutional protection given to parents who have not, through their actions, lost their natural rights to those who are mere biological parents and have abandoned all claim to human dignity. Merely biological breeding without the sanctity of familial relationship of love, human dignity and respect is certainly not deserving of the blessings of constitutional protection. It is vitally important to distinguish in the application of this law between the fit and the unfit parents. Admittedly, it is seldom an easy chore. In drawing the difficult line, a court can only be guided by the question  how will the alleged unfit parent affect the child? The mere animal instinct of some affection to an offspring is not enough. The parents in this case evinced little more than that.
I do not believe that Syllabus 1 of the opinion completely states the law. In addition, the last line of Syllabus 8 confuses an otherwise proper statement of law. I agree with the statement of Syllabus 4, except that part which indicates that the passage of time, coupled with the due process omissions of the State, make an otherwise initially legal act void ab initio.
Finally, I am not clear whether the majority opinion would dispose of the adoption proceedings pending at the time this case was decided by virtue of the last paragraph of the opinion relating to the principles of res judicata. If so, I disagree with that application of the doctrine of res judicata. The parties and issues were identical in both proceedings in State ex rel. West Virginia Department of Public Assistance v. See, 145 W.Va. 322, 115 S.E.2d 144. That holding, therefore, would not govern prospective adoption proceedings in this case. The prospective adoptive parents of Ronald Lee Willis were not parties to this proceeding and the issue of their previous prolonged custody of the child and similar issues were not considered.