No. 22-0045 – *In re C.M.-1 and C.M.-2*

**FILED**

**March 27, 2023**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WOOTON, Justice, dissenting:

In this abuse and neglect proceeding, the circuit court dismissed the petition against the respondent K.P. ("the father") and determined that the Department of Health and Humans Resources ("DHHR") failed to meet its burden of proof in order to establish that the father was abusing and neglectful due to his abandonment of the child, C.M.-2.[1] The majority reverses the circuit court's factual determination that the father did not abandon the child, and in so doing ignores this Court's applicable standard of review and the fact that the DHHR utterly failed to prove the father was an abusing and neglectful parent to his child. Therefore, I respectfully dissent.

To begin, this Court's well-established standard of review provides:

> "[a]lthough conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, *the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.* However, a reviewing court may not overturn a finding simply because it would have

---

[1] *See* W. Va. Code § 49-1-201 (Supp. 2022) (defining abandonment and discussed *infra* in greater detail).

decided the case differently, *and it must affirm a finding if a circuit court's finding is plausible in light of the record viewed in its entirety*."

Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996) (some emphasis added); *accord* Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). Further, we stated in *In re Emily*, 208 W. Va. 325, 540 S.E.2d 542 (2000), that

> in the context of abuse and neglect proceedings, the circuit court is the entity charged with weighing the credibility of witnesses and rendering findings of fact. Syl. pt. 1, in part, *In re Travis W.*, 206 W.Va. 478, 525 S.E.2d 669 ("[W]hen an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. . . ."[)](internal citations and quotations omitted)). This Court, therefore, cannot set aside a circuit court's factual determinations unless such findings are clearly erroneous. *Id*.

208 W. Va. at 339, 540 S.E.2d at 556.

Despite the foregoing, the majority, relying solely on a Tennessee case involving adoption,[2] pronounces that "[w]hether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law."[3] Critically, the concept of "willful

---

[2] *See In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013).

[3] Interestingly, no other jurisdiction relies on this Tennessee case for the proposition relied upon by the majority.

abandonment" does not exist in West Virginia's statutory schemes governing either abuse and neglect or adoption proceedings. *See supra* note 1; W. Va. Code § 48-22-306 (2015). Moreover, the majority's holding in the instant case contradicts this Court's recent holding in *In re Adoption of H.G.*, 246 W. Va. 105, 866 S.E.2d 170 (2021), wherein we held in syllabus point four that "[w]hether a birth parent has abandoned his or her child under West Virginia Code § 48-22-306 (2015) is a question of fact to be determined from the evidence." 246 W. Va. at 107, 866 S.E.2d at 172, Syl. Pt. 4. Our precedent is well established that factual findings are reviewed by this Court under a "clearly erroneous" standard of review. *See In re Tiffany Marie S.*, 196 W. Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1.

The necessary factual findings in this case were based upon definitions found in West Virginia Code section 49-1-201, which defines abandonment as "any conduct that demonstrates the settled purpose to forego the duties and parental responsibilities to the child[.]" However, this definition cannot be viewed in a vacuum; rather, it must be considered in connection with the definition of a "neglected child," or a child

> [*w*]*hose physical or mental health is harmed or threatened by a present refusal, failure or inability of the child's parent*, guardian, or custodian to supply the child with necessary food, clothing, shelter, supervision, medical care, or education, when that refusal, failure, or inability is not due primarily to a lack of financial means on the part of the parent, guardian, or custodian[.]

*Id.* (emphasis added).[4]  Only after first considering the evidence of whether a parent's conduct meets the statutory definition of abandonment and whether a child meets the statutory definition for a "neglected child" can the circuit court then make the legal determination of whether the parent should be adjudicated as abusing or neglectful.  *See* W. Va. Code. § 49-4-601(i) (Supp. 2022).

The majority's attempt to turn what is clearly a question of fact into a question of law is a means to justify its de novo review of the case – a complete re-examination and reweighing of the facts – in order to come to a conclusion different from that reached by the circuit court.  Let there be no mistake; the majority's review of the circuit court's order should have focused on whether the court's factual determination that the evidence failed to support a finding of abandonment was clearly erroneous, not on whether the evidence demonstrated abandonment as a matter of law.

---

[4] These statutory definitions of abandonment and neglect are part of the entire statutory scheme designed to protect children.  As such "[s]tatutes in pari materia must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect." Syl. Pt. 3, *State ex rel. Graney v. Sims*, 144 W.Va. 72, 105 S.E.2d 886 (1958); *accord* Syl. Pt. 2, in part, *Beckley v. Kirk*, 193 W.Va. 258, 455 S.E.2d 817 (1995) (same); Syl. Pt. 5, in part, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975) ("Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in [p]ari materia to assure recognition and implementation of the legislative intent.").

The evidence presented by the DHHR to meet its burden of proof in regard to the father's abandonment of his child consisted of only one witness – the child's mother.[5] The father testified on his own behalf. Because the DHHR's case revolved around the testimony of a single witness, the court's credibility determinations were key to its decision. Yet, the majority's decision to disregard factual findings made by the circuit court simply because the majority disagrees with those credibility determinations is exactly what has transpired in this case. *See In re Tiffany Marie S.*, 196 W. Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1.

At the adjudicatory hearing the mother testified that while child support had been ordered and was being paid by the father, she was "only receiving it as a tax" and seemingly did not understand the cause of that. She further testified that the father had not seen his child since the family court hearing "during the time of finding out that [the child] was biologically [the father's] and "they were fixing up . . . child support." Significantly, she testified that it was the father who requested the paternity test. She also stated that the father had not requested contact with his child and had not sent any cards or gifts to his child since the child's birth. She testified that the means of communication between her and the father was Facebook messenger; however, she further stated that her current husband read her Facebook messages and told her "it was pointless" for her to read the

[5] Contrary to the circuit court's order entered on December 17, 2021, the DHHR did not present any evidence or testimony from the CPS worker, Marli Currey.

messages so she had "no idea really what [the father] did say. . ." She also testified that the father had done nothing to institute family court proceedings for the purpose of forcing her to let him see and speak with his child.

In contrast, the father testified that he currently lived and worked in Flint, Michigan. He has two other children, ages sixteen and fifteen, who reside with him. He testified that he was incarcerated between May, 2015, and August, 2017, for distribution of heroin. Since his release, he testified that he had maintained his sobriety and was gainfully employed. Even though he had suspected the subject child was his, it was during the period of his incarceration that he decided to find out for sure. He wrote to the DHHR seeking to have his paternity established through testing, and the paternity test proved he was the child's father. The father testified that was ordered to pay, and was paying, child support in the amount of $257 per month, which was taken out of checks weekly; he stated that he was only $517 behind on his child support obligation and that the arrearage was attributable to a period of unemployment. He also stated that he had wired money to the mother on February 23, 2018. He did not ask the family court to set up scheduled visitation because he thought he and his child's mother could work it out. As the father stated: "I didn't need to involve the courts in my life to be a parent. I reached out and tried to do it with her as a co-parent." He did not want to fight the mother in court. He testified that following his release from incarceration, he tried to contact the mother so that he could establish a relationship with the child, and that he could show through text messages via

Facebook that he reached out to mother to discuss what they would do beyond the paternity test. He testified that he provided his attorney with "three years of conversations with me and [mother] trying to determine [he] could see [his child], be in [his child's life] and was denied all three years." He stated that at times it was the mother's current husband who responded to messages he sent to her and that he knew when mother was not the one responding to his Facebook messages because the mother's husband was rude and disrespectful. He also testified that by July 2020, the mother had blocked him on Facebook. The only time he had seen his child was after the family court hearing in which child support was established. He stated that he desired a relationship with his child; however, the mother had not allowed him to have any contact. He testified that he didn't want to take the child from the mother, just to be the child's father. Finally, the father testified that he paid for the mother's drug rehabilitation when she was pregnant with his child and "[s]he always tell [sic] me she was clean so, no, I didn't think she was going to go down that path . . . ."

Based on the foregoing evidence presented at the adjudicatory hearing, the circuit court determined that the DHHR had not met its burden of proof to establish that the father had abandoned his child. Specifically, the court found that the mother "had

denied [the father] access to the child," and the father had "paid significant support and thought [the mother] to be sober."[6]

Ignoring or discounting most of the father's testimony, the majority casts aside the circuit court's findings and engages in its own fact-finding, focusing on the father's child support payments and the father's supposed "disregard" for the child's well-being. The majority also ignores the uncontestable fact that there was no evidence offered by the DHHR that the father "disregarded his obligation to pay monthly" child support payments. Although he had a small arrearage resulting from a period of unemployment, he consistently paid child support from the time his paternity was established.

Moreover, I fundamentally disagree with the majority's reliance on *In re M.M.*, No. 12-0491, 2012 WL 4069593 (W. Va. Sept. 7, 2012) (memorandum decision), and *In re Adoption of C.R.*, 233 W. Va. 385, 389-90, 758 S.E.2d 589, 593-94 (2014), to support its determination that "child support payments alone do not prevent an

---

[6] The majority takes issue with the circuit court's finding that the father believed that the mother was sober. Instead, the majority finds that it "contravenes Father's admission that he knew Mother used drugs" which the father "would have learned of . . . with a basic inquiry into his child's life." The majority further finds that "the circuit court should have given minimal consideration to Father's self-serving, contradictory statement." In short, the majority is overturning the circuit court's factual findings because it weighed the evidence differently, which is in direct contravention of this Court's standard of review. *See In re Tiffany Marie S.*, 196 W. Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1.

abandonment finding." In *In re M.M.*, the petitioner father did not assign error to the circuit court's finding of abandonment, which was based upon the father's failure to pay child support and his inability to care for the child, all due to his incarceration. Importantly, there had been prior abuse and neglect proceedings involving the petitioner father which established that he had virtually no contact with the child and failed to be a caregiver. *Id.* at *3.

Likewise, in *In re Adoption of C.R.*, 233 W. Va. 385, 758 S.E.2d 589 (2014) (per curiam), the Court reversed and remanded a case in which the circuit court denied a petition for adoption in which the biological father, a registered sex offender, refused to consent to the child's mother and stepfather adopting the child. *Id.* at 386, 758 S.E.2d at 591. In reversing the circuit court's conclusion that the biological father's involuntary child support payments through wage withholding were sufficient to overcome the statutory presumption of abandonment, this Court specifically noted that he had not had contact with the child even when he was married to the mother. The biological father also had failed to provide any support to his child during the marriage, for a period exceeding four years. *Id.* at 389, 758 S.E.2d at 594. Significantly, this Court did not hold, in a syllabus point or otherwise, that involuntary child support payments were dispositive of the issue of abandonment; rather, we simply found such payments were not sufficient, standing alone, to overcome the statutory presumption of abandonment in light of the other facts and circumstances of the case.

Moreover, I have previously expressed my disagreement with the proposition that involuntary child support payments are insufficient evidence of financial support:

> [I]n *Adoption of C.R.*, as well as other memorandum decisions which rely upon that case for the proposition that a parent's involuntary wage withholding is insufficient evidence of financial support, the Court completely failed to discuss, acknowledge or reconcile how involuntary payment of child support through wage withholding fails to constitute financial support of a child "within the means of the birth parent." Rather, the Court simply focused on the proposition that a parent has a duty to support his or her child. *See id*. at 389-90, 758 S.E.2d at 589-90 (citing various cases supportive of the principle that a parent has an "irrefutable duty to support his child"). Again, these cases are devoid of any discussion or analysis regarding why involuntary support payments of child support fail to meet this factor. The notion that a parent is "failing" to financially support his or her child simply because the support payments are being "involuntarily" withheld from his or her wages is not supported by the statutory language addressing such support. *See* W. Va. Code § 48-22-306(a)(1).

*In re Adoption of H.G.*, 246 W. Va. 105, 120, 866 S.E.2d 170, 185 (2021) (Wooton, J., dissenting).

Further, there was absolutely no evidence offered by the DHHR to support the majority's finding – a finding unmoored from any legal foundation – that the father evinced a "manifest disregard for" the child's well-being.  To the contrary, the evidence before the circuit court was that the father had been denied access to his child by the mother and her new husband.  He had been provided no information that his child was in any

harm's way or any sort of danger by remaining in the mother's care and custody. Again, the DHHR offered no evidence to refute the father's testimony in this regard.

Succinctly stated, the majority's decision lacks any basis from which one can arrive at a "firm conviction" that the circuit court clearly erred in its findings of fact and conclusions of law. *In re Tiffany Marie S.*, 196 W. Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1. The circuit court did not err in finding that the DHHR failed to present sufficient evidence to refute the father's testimony that that he sought to have paternity established; that after finding that he was the child's father he repeatedly tried to establish contact and a relationship with his child; that he paid child support consistently when he was working and was only $517 in arrears; that he was blocked from communicating with the mother in his efforts to establish a relationship with his child, and that the mother's current husband responded disrespectfully to messages the father attempted to send to her; and that the mother told him she was sober and he believed her.

Even more concerning than the majority's complete disregard of the DHHR's failure to carry its burden of proof to establish that the father abandoned his child and that the child was a "neglected child," is the majority's creation of a brand-new burden of proof: with no new syllabus point, and in the absence of any supporting law, the majority holds that a parent risks termination of his or her parental rights based on abandonment unless, in addition to paying child support, he or she undertakes to investigate a child's

11

living environment, presumably to ascertain whether the child is at risk of being neglected and/or abused. Specifically, the majority states that "[a] parent with a genuine interest would have investigated his child's life circumstances, [should have] sought court intervention to assert his parental rights, and certainly would not rely solely on Facebook messages to the child's mother as a feeble attempt to assert his parental rights."

Placing such a burden on a parent in the context of an abuse and neglect proceeding completely ignores the duties and responsibility that are statutorily placed on the DHHR. Further, the creation of such a duty will have a discriminatory impact on those parents who do not have the financial means to pursue civil actions in order to be allowed access into their children's lives in order to undertake some sort of "investigation." Moreover, it forces unwanted and unnecessary litigation on parents who seek to work out decisions such as visitation outside the judicial process – which is something to be encouraged, not discouraged by mandating that a parent see court intervention at the risk of having his or her rights terminated.

This Court has previously held:

> "In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions."

Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973). Sadly, the majority has deemed it fitting to adjudicate this father as having abandoned his child, even though he wanted – and sought – to have a relationship with the child. He affirmatively sought to have his paternity established, he has been paying child support, and he tried to establish a relationship with the mother (to whom he was not married), only to have her deny him access to the child. He tried to work things out through contact with the mother, as he did not want to interfere with her relationship with the child. In a case where there is a complete lack of any evidence that this child was ever placed in harm's way by the father's conduct, the logic of adjudicating this parent as abusing or neglectful escapes me. It certainly begs the question of how this could be in the child's best interest. Upon remand, I would encourage the father through his counsel to file a written motion seeking a post-adjudicatory improvement period whereby the court can order that he have contact with the child, in hopes that this child can be reunified with the father. *See* W. Va. Code § 49-4-610 (2015); Syl. Pt. 4, S*tate ex rel. P.G.-1 v. Wilson*, 247 W. Va. 235, 878 S.E.2d 730 (2021) ("A circuit court may not grant a post-adjudicatory improvement period under W. Va. Code § 49-4-610(2) (eff. 2015) unless the respondent to the abuse and neglect petition files a written motion requesting the improvement period.").

For all these reasons, I respectfully dissent.