IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

_____

No.12-0808

_____

FILED

June 5, 2013

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: JESSICA M. AND SHAWNTA M.

_____

Appeal from the Circuit Court of Gilmer County
Honorable Jack Alsop, Judge
Case Nos. 09-JA-2 and 09-JA-3

REVERSED AND REMANDED WITH DIRECTION
_____

Submitted: May 15, 2013
Filed: June 5, 2013

Keisha D. May, Esq.
Ciccarello, Del Giudice & LaFon
Charleston, West Virginia
Counsel for the Petitioner

Patrick Morrisey
Attorney General
Lee A. Niezgoda, Esq.
Assistant Attorney General
White Hall, West Virginia
Counsel for the Respondent

Michael W. Asbury, Jr. Esq.
Asbury Law Office, PLLC
Clay, West Virginia
Guardian ad litem

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1. "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S*., 196 W.Va. 223, 470 S.E.2d 177 (1996).

2. "In the law concerning custody of minor children, no rule is more firmly established than the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syl. Pt. 1, *In re: Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

i

3.  "The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof."  Syl. Pt. 6, *In re: Willis,* 157 W. Va. 225, 207 S.E.2d 129 (1973).

4.  " ' " 'A parent has the natural right to the custody of his or her infant child, and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.' Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d [798] (1969)." Syl. pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975).' Syl. Pt. 1, *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987)." Syl. Pt. 2, *In Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991).

Per Curiam:

Petitioner, Lucinda M. (hereinafter "Lucinda" or "mother"), appeals the June 13, 2012, order of the Circuit Court of Gilmer County terminating her parental rights to her children Jessica M. and Shawnta M.[1] The mother maintains that the lower court erred because the evidence shows both that she successfully complied with and utilized the services she was provided during the court-authorized improvement period, and made the changes necessary to assure the safety of her children in her care. Respondent, West Virginia Department of Health and Human Resources (hereinafter "DHHR"), is joined by the guardian ad litem[2] in arguing that the facts of this case support the termination of the mother's rights to satisfy the children's need for permanency and stability.

Following a complete examination of the record accompanying the appeal, we reverse the order of the circuit court and return the matter for development of a reunification plan consistent with this opinion.

---

[1]Pursuant to Rule 40 of the *West Virginia Rules of Appellate Procedure*, the identities of juveniles are protected in Court documents. Initials or descriptive terms are used instead of full names to promote confidentiality.

[2]Three different lawyers have served as guardians ad litem for the children during the course of this case. As explained during oral argument by the guardian representing the interests of the children in this appeal, he was not directly involved with any of the proceedings below and his representations as to what occurred during those proceedings were limited to the contents of the record.

## I. Factual and Procedural Background

Lucinda is the biological mother of two girls, Jessica and Shawnta. An abuse and neglect petition was filed on March 19, 2009, by the DHHR against Lucinda and her husband, Jesse M., the biological father of the children. The petition contained the allegation that Jessica and Shawnta, then aged three and two respectively, were abused and/or neglected children due to their exposure to domestic violence and drug use by the father in the home.

An adjudicatory hearing was held on May 29, 2009, at which the mother admitted to being the victim of domestic battery and to not removing the children from a home where the father used illegal substances in their presence. The father on the other hand denied all allegations. The circuit court determined the evidence established that the children were abused and neglected by the parents.

Soon after the adjudicatory hearing, the father voluntarily relinquished his parental rights. The court accepted the relinquishment and terminated the father's parental rights at a June 29, 2009, dispositional hearing. At a separate dispositional hearing, Lucinda was granted a six-month post-adjudicatory improvement period, which was extended by three months. Before the three-month extension expired, DHHR filed a motion to terminate the mother's parental rights, to which the guardian ad litem concurred. Following a hearing in March 2010, the circuit court denied the motion and granted Lucinda a one-year

2

rehabilitation period. The court found that Lucinda was meaningfully engaging in services and should receive the treatment recommended in her psychological evaluation. The mother apparently complied with and benefitted from the services provided as it is uncontested that the mother sought and received unsupervised, overnight supervision with the children in December 2010, and that the visitation was increased at a March 2011 hearing. When the court granted the mother additional visitation, it also ordered DHHR to develop a case plan for unification of the mother with the children. Although the guardian ad litem had concurred with reunification at an April 2011 status hearing, he moved to temporarily suspend visitation on May 6, 2011. According to the June 13, 2012, order terminating the mother's rights, the guardian's motion was "based on the fact the West Virginia DHHR reported sexualized behaviors being exhibited by the Infant Respondents in this matter." It appears from the briefs that the court suspended visitation and directed DHHR to conduct an investigation. DHHR filed an amended motion to terminate the mother's parental rights on May 24, 2011, and the matter was set for dispositional hearing.

The dispositional hearing was held on July 8, 2011. DHHR called three people to testify: a volunteer who worked at the school where the children attended pre-kindergarten classes, a man who had lived in a trailer near where the mother had moved, and the Child Protective Services (hereinafter "CPS") worker assigned to the case. The mother also called three witnesses: two workers who provided services to the mother involving

3

parenting, supervised visitation, and transportation, and the therapist who had been counseling the mother for a year and a half on a regular basis.

The school volunteer testified that she had discovered Jessica sitting on a commode in the school's bathroom closely examining her vagina with the lips of the vagina spread apart. The volunteer said that she did not ask the child what she was doing or why she was doing it either when she observed the child or after the child followed her out of the bathroom  The only additional information the volunteer provided was that later the same day Jessica unexpectedly said during nap time that her mother had warned her "to watch these two boys that rides bicycles up to our house . . . that they might touch us."

The neighbor called by DHHR to testify was unable to place the mother at a bonfire gathering where attendees were drinking on May 9, 2011. He further denied telling the CPS worker that he saw her at this event. He said that he really did not know the mother, but his stepfather who lived in the same neighborhood did. The stepfather did not appear as a witness.

Before the CPS worker testified, DHHR moved to have the prior testimony regarding the observations and interview of a Maureen Runyon at some unspecified hearing incorporated into the record. The mother's counsel pointed out that she had objected to the admission of the Runyon report at a previous hearing at which Ms. Runyon was not in

attendance. The court stated, "The Court will take judicial notice of the prior testimony, but I – I – if you want Ms. Runyon's testimony in, you'll have to call Ms. Runyon as a witness." It became apparent from the CPS worker's testimony that Ms. Runyon was the DHHR employee who interviewed Jessica about the sexualized behaviors the child was exhibiting, behaviors the CPS worker called masturbation. The CPS worker had no firsthand information regarding what Jessica had said about her conduct, and the worker further said that Jessica "did not tell me she learned sexual behaviors from her mother."

The CPS worker also expressed concern with the mother's choice of people with whom she associated. The mother's husband[3] had been abusive and her chosen boyfriend also was inclined to violence. The CPS worker admitted that the mother had told him she stopped seeing the boyfriend. The CPS worker also was concerned that even though the mother followed the multidisciplinary team's advice to move to a different residence, he faulted the mother for choosing a new home without taking advantage of the assistance available from DHHR. He admitted the assistance from DHHR was not a court ordered requirement for relocation, and went on to testify that when he visited the home once the mother relocated, he completed a report saying it was a safe, proper and adequate home. He explained that he now had reservations with the new home because it was near the residence of at least one relative of the mother's former boyfriend. However, on cross-examination

---

[3]From general discussions during the dispositional hearing it was established that the mother had at some point divorced the husband.

5

the CPS worker said he had no evidence that the mother relied on anyone in the former boyfriend's family to find the new home, that she actually knew of any relationship between the former boyfriend and her neighbor, or that the boyfriend had been to the new home or knew where the mother had relocated. In response to the court's inquiry of how far away the boyfriend lived, the CPS worker said he lived in another county that would be a thirty-five to forty minute drive from where the mother had moved.

The CPS worker also faulted the location of the new home being situated in the same neighborhood as a man who was a registered sex offender. Jessica had told the CPS worker that she had seen a man standing at the edge of the mother's yard – which was explained to be a field – staring in the direction of the children. A man matching the description the child had given was located by the CPS worker. The worker said he believed the man was or had been a registered sex offender; no proof of this status was produced.

Although repeatedly expressing his concern that the mother was not always truthful with him, the CPS worker said that the mother had been successful in parenting classes and therapy sessions and had complied with everything that DHHR had asked of her. He did admit on cross-examination that he had no evidence that the mother harmed her children in any way.

Two service providers contracted by DHHR to provide services to the mother during the improvement period were called by the mother to testify. They each had worked individually with the family. One worker supervised visitations between the mother and the children and provided parenting classes to the mother. Regarding the visitations, the worker said that the children were excited to see their mother and the mother interacted with them appropriately. She testified that the mother did well with the parenting classes and became adept at applying the learned skills to new or changing scenarios. In addition to supervising visitations and teaching parenting skills, the other worker offered training on adult life skills and safety plans for the home. She testified that the mother always participated in the instruction and cooperated in making improvements as suggested.

The final witness the mother called to testify was the therapist who had treated her for a year and a half. The therapist said that he had both counseled the mother and had the opportunity to watch her interact with Jessica and Shawnta. Asked about his observations of the children with the mother, the therapist said "[t]he children were very caring toward their mother. They were not in the least bit intimidated. They were not afraid. They were . . . were very huggy, feely, touchy. She was constantly making sure that they were taken care of . . . . She was the epitome of – of a domestic figure." The therapist also said that the mother had complied with everything that he had requested of her during the sessions. He observed that the mother has come to the realization "that she doesn't necessarily need a man in her life, she's able to take care of herself . . . . Right now she

7

wants to focus on her children and their well-being and not a relationship nor any type of interaction with a male." When asked if the mother needed further counseling, the therapist said that he was taking a new job elsewhere, but he thought the mother would benefit from a new therapist who could be an objective third party to discuss any stressors in her life. However, the therapist made clear during cross examination that the mother was capable of providing a safe environment for her children by stating, "I'm absolutely certain she can protect her children."

The court inquired of the therapist about whether he was aware of the allegation that the mother had taught Jessica how to masturbate. The therapist said this issue had been discussed during the therapy sessions. The mother expressed deep concern with Jessica's self-gratifying behavior, and the mother questioned why it was occurring and how Jessica had learned of these things. In response to a follow-up question, the therapist said he had not had individual counseling sessions with Jessica.

When asked by the guardian ad litem whether he would be concerned for the safety of the children if a child disclosed that her mother taught her to masturbate, the therapist said he would if he believed the mother had done so. The therapist went on to say that based upon his interaction with the mother he had no doubt she was telling the truth. The court proceeded to ask the therapist if a parent's rights should be terminated if a child's disclosure that the parent taught the child to masturbate were true. The therapist said "[i]f

8

the disclosure is true . . . it is a[n] honest to goodness verifiable fact, then, yes, I would have concerns" which would warrant termination of parental rights.

The dispositional hearing concluded with the court taking the matter under advisement.

On July 29, 2011, the mother filed a motion requesting an evidentiary hearing in order to present new evidence that became available after the dispositional hearing. The evidentiary hearing was held on March 7, 2012.[4] The testimony offered at the hearing came from five people the mother called to testify. One person was a woman who had supervised visitation with the family on July 15, 2011; another was the new therapist the mother began seeing in August 2011; and three were involved in arranging and completing a neuropsychological evaluation of the mother to determine her cognitive abilities.

The worker who had provided supervised visitation services to this family from March 2011 to July 15, 2011, testified that she routinely made reports to the CPS worker after each visitation. Referring to her report of a July 15, 2011, visitation, the worker said that Jessica had come to the worker out of a swimming pool where she had been with

---

[4]The delay in holding the requested evidentiary hearing appears to be due to the guardian ad litem not submitting a written response requested by the court until February 2, 2012.

the mother and Shawnta. The worker said that Jessica was upset and essentially recanted the alleged initial statement about her mother teaching her about masturbation.

The new therapist who testified had only seen the mother a few times since assuming the case, but she said she had been familiar with the case prior to working directly with the mother and agreed with the former therapist's assessment. She further stated in response to questioning that she never saw anything in the mother's character during the counseling sessions that would indicate the mother was attempting to conceal, deceive, lie or be dishonest about anything. When questioned by the guardian ad litem as to whether it would surprise the therapist to learn that the mother had a history of making poor decisions regarding the care of her children she said, "It would now . . . . [even though] [i]t would not surprise me in the past."

Dr. Marc Warren Haut, a professor and clinical neuropsychologist at West Virginia University, testified about the results of the mother's neuropsychological evaluation. He said that the referral that was received asked for a determination of: (1) the extent of any brain problems the mother may have due to epilepsy and to a brain injury she had as an infant; and (2) whether these problems would have continuing effects on her psychological functioning. The doctor said the referral was made so that appropriate therapy could be provided. Dr. Haut said the conclusion he reached was that the mother had minor deficits due to her history of brain trauma but "her deficits were really pretty mild" and "she

10

was doing very well from a psychological standpoint also." He went on to say that from the perspective of her thinking skills there was "no deficit that would preclude her from raising her children."

At the conclusion of the testimony the court once again took the matter under advisement. On June 13, 2012, an order terminating the mother's parental rights was issued. With apparent reliance on the CPS worker's testimony at the dispositional hearing, the court determined that the mother "is a neglectful parent, as she has failed to provide a fit, apt, and suitable home and establish an appropriate environment for the infant children in this matter." The order reflects the court's findings that: the mother participated in rehabilitative services but failed to benefit from them in ways that would protect the children; Jessica was never called as a witness to recant "to the Court the assertion she made that her mother taught her about masturbation;" that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the future; and that termination of parental rights would be in the children's best interests. It is from this order of termination that the mother appeals.

## II.  Standard of Review

A compound standard of review is applied in appeals resulting from abuse and neglect proceedings. *In re Emily*, 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). That

compound standard is summarized in syllabus point one of *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996), in the following manner:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

It is with these considerations in mind that we consider the matter before us.

### III. Discussion

The thrust of the argument made by the mother through her counsel in this appeal is that the evidence relied upon by the circuit court to terminate the mother's parental rights did not rise to the requisite level of proof required to terminate her legal and protected right to parent Jessica and Shawnta. The mother's counsel maintains that the primary reason set forth in the order for terminating the mother's parental rights is that Jessica was not called to testify at the evidentiary hearing to recant a statement that was not introduced as evidence in this case. She asserts that the evidence DHHR presented did not demonstrate or prove that

12

the mother nor anyone else inappropriately touched Jessica and/or Shawnta, or that the mother provided inadequate care for her daughters.  She points out that the only witness who provided unfavorable testimony about her efforts and progress was the CPS worker, which failed to rise to the level of clear and convincing proof that is required for termination of parental rights.

DHHR maintains the correctness of the decision to terminate the mother's parental rights.  The agency maintains that the evidence showed the mother participated but did not fully avail herself of the services provided during her improvement period and failed to make the changes necessary to assure the safety of the children in her care.  The guardian ad litem maintains that deference should be afforded to the circuit court's decision to terminate the mother's parental rights.  He argues that the evidence in the appendix record sufficiently demonstrates that the mother could not reasonably correct the conditions leading to the filing of the original petition.

This Court has long recognized a constitutional dimension to a  parent's right to the custody of his or her minor children.   In syllabus point one of *In re: Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973), we stated:

> In the law concerning custody of minor children, no rule is more firmly established than the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and

guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

The right is not absolute in that it can be limited or terminated by the State if a parent is proven unfit through proceedings affording the parent due process of law. Syl. Pt. 5, *Id*. Statutorily, termination is proper only when "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and[] when necessary for the welfare of the child . . ." W. Va. Code § 49-6-5(a)(6). The phrase "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" is later defined in the statute as meaning "based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help." W. Va. Code § 49-6-5(b).

Given the significance of parental rights, a heightened level of evidentiary proof is necessary to warrant termination. "The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof." Syl. Pt. 6, *In re: Willis*.

In terminating the mother's parental rights in the present case the lower court made the following findings and conclusion:

> 1. The Court finds that dismissing the petition is totally inappropriate, in that the *circumstances out [of] which this petition arises, still exist* and to dismiss the petition would greatly endanger the health, safety and welfare of the children.

14

2. The Court finds that referring the children, the abusing parent, or other family members to a community agency for needed assistance and dismissing the petition is not appropriate in that the Respondent *Mother, has participated but has failed to benefit from services, including counseling or other rehabilitative services which would result in the reasonable steps necessary to cooperate with the Petitioner [DHHR] to attempt to remedy the problems out of which this petition arose*. Therefore, the Respondent Mother is unable, in a meaningful way, to properly engage and benefit from counseling or other rehabilitative services that would protect the children from being exposed to the abuse in the future.

3. The Court finds that returning the children to the home under the supervision of the state department is inappropriate, in that the *Respondent Mother has failed to benefit from intensive services that specifically address her poor decision making ability and ability to make informed decisions regarding the children.* Therefore, even with supervision from the state department, the children would not be adequately protected.

4. The Court finds that to order terms of supervision calculated to assist the children and any abusing parent which prescribe the manner of supervision is inappropriate, in that such disposition does not rehabilitate the parent so as to achieve a goal of return of the children, in that the Respondent *Mother has failed to take reasonably necessary steps to protect the children in the future from the acts of abuse that led to the filing of this petition. Further, the Respondent Mother has failed to adequately address her poor decision making skills and ability to protect the children, even after counseling and services to address these issues.*

5. The Court finds that the granting of custody of the children to the temporary custody of the state department, a licensed child welfare agency, or suitable person, who may be appointed guardian, is inappropriate, in that there is no reasonable likelihood that the conditions of neglect, out of which this petition arose, will be substantially corrected in the

foreseeable future.  Therefore, *the temporary placement in the state department is contrary to the best interest of the children and would only further delay the ultimate disposition of termination of parental rights in this matter*.

6.  The Court is of the opinion and so finds that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the future, in that the *Respondent Mother has failed to benefit from intensive services and remedy the actions which led to the filing of this petition.* Further, the best interest and welfare of the children requires permanent termination of the parental rights of the Respondent Mother in this case.

### III.  CONCLUSION

It is **ADJUDGED** and **ORDERED** that based on the above reasons there is no less restrictive alternative than termination of Respondent Mother's parental rights.  The Court finds the evidence adduced at the evidentiary hearing on March 7, 2012, provided no evidence that there is a reasonable likelihood that the conditions out of which this abuse and neglect petition arose will be corrected within the reasonably foreseeable future.  Respondent *Mother in this case has provided no credible evidence that she can and will make properly informed decisions regarding the children's welfare and best interest.  The Court has given the Respondent Mother in this case numerous opportunities and the Respondent Mother has failed to meet the requirements to get her children returned to her.  The Court finds the termination of Respondent Mother's parental rights is in the best interest of the two children involved in this matter. . . .*

Emphasis added.  These determinations do not reflect the specific factual basis relied upon

by the circuit court, nor does the record in this case supply justification for the

determinations.

16

DHHR aptly summarized the circuit court's findings supporting termination as: (1) the mother participated but did not fully avail herself of the services provided during her improvement period; and (2) the mother failed to make the changes necessary to assure the safety of the children. It appears the only service to which the mother did not "fully avail herself" was taking DHHR up on its offer to help her find a place to live. Testimony established that the mother cooperated with the services which were provided to her, and was compliant and successful throughout the rehabilitation period. The professionals providing services to the mother indicated that she could successfully and safely parent her children. They also witnessed interactions between the children and the mother and found them to be positive and welcome interactions. Only the CPS worker expressed reservations with the mother's judgment and ability to parent or to tell the truth.

If evidence existed to support any of the suspicions the CPS worker voiced during his testimony, DHHR was sorely remiss in producing that evidence and making it part of the record. One of the most glaring examples of unsubstantiated evidence surrounds Jessica's sexualized behaviors. It appears that the circuit court gave improper emphasis to DHHR's unsubstantiated allegation that the mother taught the child how to masturbate. The only quote from the dispositional hearing transcript contained in the order of termination was that of the CPS worker responding to questions of the prosecutor representing DHHR, which reads in pertinent part as follows:

17

THE WITNESS: In light of history, what has happened even since January, she consistently appears to gravitate towards people of character that she's been warned to stay away from. Her judgment, in my mind, is in question. I can – I question whether she can adequately protect these kids in the event that –

I look at this child's behavior, and the most recent behaviors with – with –

MR. HOUGH: This child being?

THE WITNESS: Jessica. I'm sorry.

MR. HOUGH: Okay.

THE WITNESS: With – with the masturbation, and . . .

Further, there is the factual finding in the order stating:

22. The Infant Respondent, Jessica [], never recanted to the Court the assertion she made that her mother taught her about masturbation. No party ever called her as a witness.

The allegation that Jessica made statements about the mother teaching her self-gratifying behaviors was never corroborated by the testimony of the child or by the DHHR worker – Maureen Runyon – who purportedly conducted a forensic interview with the child and wrote a report. As noted earlier, the transcript of the disposition hearing reflects that Ms. Runyon was not present and also had not attended an earlier hearing. Moreover, the circuit court stated at the dispositional hearing: "[I]f you want Ms. Runyon's testimony in, you'll have to call Ms. Runyon as a witness." Even during oral argument before this Court, no one was able to identify how or when evidence of the child's alleged statements in this regard were actually made a part of the record. There is simply no documentary or testimonial

18

evidence in the record which verifies this allegation. Furthermore, the CPS worker who did testify said he had no firsthand information regarding what Jessica had said about her "sexualized behaviors," and the worker further said that Jessica had not told him that she learned sexual behaviors from her mother. Thus any reference this CPS worker made during his testimony about Jessica's sexual behaviors was hearsay. As to the trial court's concern with the child not being called to recant the "assertion," recantation presupposes that a statement is made in the first place. Again, no assertion or statement of the child is in the record.

The CPS worker also failed to corroborate other allegations he made, and DHHR did not introduce supporting evidence to substantiate the CPS worker's allegations. For example, neither the former boyfriend nor anyone from the former boyfriend's family testified at the dispositional hearing to validate the CPS worker's expressed suspicion that the mother was intending to resume a relationship with the former male companion and thus expose the children once again to a violent male figure. The testimony of the mother's therapist refuted the CPS worker's unsubstantiated concern by representing that the mother had come to the realization that she did not need men in her life in order to succeed. The therapist also said that the mother expressed her desire to be reunited with the children as her top priority, far outweighing her need for male companionship. Also, no documentation was in the record that confirmed the CPS worker's contention that a "registered sex offender" lived in the neighborhood and would be a threat to the children, or that there was anyone else

19

in the neighborhood who posed a direct threat to the children. Rather than complimenting or supporting the mother's efforts to become self-reliant for the sake of her children, the CPS worker criticized the mother when she showed initiative to make changes in her life by faulting her for locating a place to stay without depending on DHHR to do it for her. The CPS worker stated that there was no requirement that DHHR be involved in locating a suitable home. Furthermore, he said that he found the new home to be safe and adequate when he inspected it after the mother had moved.

Based upon our extensive review of the evidence contained in the record before us, we fail to see that neglect and parental unfitness have been established by clear, cogent and convincing evidence. Thus the order terminating the mother's parental rights to Jessica and Shawnta must be reversed on clear error grounds.

The evidence admitted at the dispositional hearing demonstrated that the mother visited and interacted well with her children, kept her therapy appointments, attended and was engaged in the parenting classes and appeared at all court hearings in order to be reunited with her children. Moreover, the continuing bond and affection between the mother and children was consistently observed during supervised visitations. Furthermore, the therapist who worked with the mother for a year and half testified that he believed the mother had gained a better understanding of her self-worth, and the importance of what she needed to do to be reunited with her children. As such, the evidence demonstrates that the

20

conditions of abuse and neglect have been substantially corrected and the family should be reunited. This result is in keeping with this Court's long-standing recognition that,

> " ' " '[a] parent has the natural right to the custody of his or her infant child, and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.' Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d [798] (1969)." Syl. pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975).' Syl. Pt. 1, *Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987)."

Syl. Pt. 2, *In Interest of Carlita B*., 185 W.Va. 613, 408 S.E.2d 365 (1991).

It became clear during oral argument that the mother was not granted visitation pending the appeal, so a period of adjustment is needed for the children to be removed from their foster home placement and reunited with their mother. Therefore, a gradual change in permanent custodians needs to occur. With the goal of providing the least disruptive transitional process for the children's return to their mother, upon remand the circuit court should enter all orders necessary to afford a smooth reunification of the family. The concrete reunification plan over which the circuit court retains oversight should include the provision by DHHR of all necessary and appropriate counseling services for the mother and the children. *See In re George Glen B., Jr.*, 207 W. Va. 346, 532 S.E.2d 64 (2000) (recognizing

21

the circuit court's continued responsibility in overseeing the implementation of reunification plans).

## IV. Conclusion

For the foregoing reasons, the June 13, 2012, order of the Circuit Court of Gilmer County terminating the parental rights of Lucinda M. is reversed, and the case is remanded for entry of orders consistent with this opinion.

Reversed and remanded with direction.