**FILED**

**May 29, 2026**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

_____

No. 25-227

_____

IN RE B.J.

_____

Appeal from the Circuit Court of Wood County
The Honorable Jason A. Wharton, Judge
No. CC-54-2024-JA-129

AFFIRMED

_____

Submitted: April 21, 2026
Filed: May 29, 2026

John Oshoway, Esq.
Parkersburg, West Virginia
Attorney for Petitioner Father

SaraBeth Jett, Esq.
Ravenswood, West Virginia
Guardian ad litem for the minor child
B.J.

John B. McCuskey, Esq.
Attorney General
Matthew K. Niu, Esq.
A. Bolton Caldwell Fellow
Lee Niezgoda, Esq.
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia
Attorneys for the Respondent
Department of Human Services

CHIEF JUSTICE BUNN delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "This Court reviews the circuit court's orders in abuse and neglect proceedings using the three following standards: (1) substantive rulings, such as whether the evidence supports a conclusion that a child has been abused or neglected or whether termination of parental rights is appropriate, are reviewed for abuse of discretion; (2) factual findings supporting substantive rulings are reviewed for clear error; and (3) to the extent review of the order implicates an issue of law or requires statutory interpretation, our review is de novo." Syllabus Point 1, *In re K.S.*, No. 24-740, __ W. Va. __, __ S.E.2d __ (2026).

2.      "*W. Va. Code,* [§ 49-4-601(i)], requires the State Department of [Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of [Human Services] is obligated to meet this burden." Syllabus point 1, *In Interest of S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 3, *In re B.L-1*, 251 W. Va. 92, 909 S.E.2d 127 (2024).

i

3. "'The standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof.' Syllabus Point 6, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973)." Syllabus Point 2, *In re K.V.*, 251 W. Va. 418, 914 S.E.2d 517 (2025).

**BUNN, Chief Justice:**

Following the birth of B.J.,[1] the West Virginia Department of Human Services ("DHS") filed a petition alleging that B.J. was abused and neglected based, in part, on the parents' recent involuntary termination as to another child, R.K., and because they had not experienced a change in circumstances since that prior termination of rights. The petition concerning B.J. alleged that the circuit court had previously adjudicated Petitioner Father and the mother as abusing and neglecting R.K. because they were responsible for his spiral arm fracture when he was three months old. Regarding B.J., the petition alleged that in the prior matter, Father was described as the mother's boyfriend. It further alleged that the court had involuntarily terminated "any and all rights" that Father had to R.K.

Before the circuit court in the pending matter, Father did not contest his adjudication as an abusive and neglectful parent to B.J., but he asserts for the first time on appeal that because the circuit court did not terminate his *parental* rights to R.K., the prior termination could not be considered by the court and the court did not properly adjudicate him as abusing and neglecting B.J. We find that the court properly considered the prior involuntary termination and Father's failure to change his circumstances since the

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

1

termination, and thus did not err. In turn, we affirm the adjudication and termination of the Father's parental rights to B.J.

# I.

## FACTUAL AND PROCEDURAL HISTORY

In May 2024, the DHS filed a petition shortly after B.J's birth, alleging that Father and the child's mother were previously adjudicated in October 2023 as "responsible for the injury"—a spiral arm fracture—to another child, R.K., born earlier to the mother (we refer to the prior matter involving R.K. as "the 2023 case"). R.K. was three months old at the time of the injury. The 2024 petition noted that the 2023 petition described Father as the "boyfriend" of the mother and that the 2023 adjudicatory order found that Father and the mother's explanation of what could have caused R.K.'s injury while in their "care and custody" was "not supported by the medical evidence." The 2024 petition also recognized that the circuit court, in the 2023 case, found that the petitioner and the mother were "abusive and neglectful custodians and parents" to R.K. and that the December 2023 dispositional order involuntarily terminated "any and all rights" that Father had to R.K. due to "the child's unexplained injuries as an infant." The DHS, in the 2024 petition, asserted that the parents "have not experienced a change in circumstances, as evidenced by their dishonesty and/or lack of cooperation with the [DHS] during the assessment of this case, and based on the findings of the Court in the [2023] dispositional order."

2

The petition further alleged that in May 2024, when the mother gave birth to B.J., she was positive for THC but told the social worker that she quit using marijuana when she found out she was pregnant. It also alleged that the mother told the social worker that she and Father were first-time parents, so they were protective. When asked whether B.J. was her first child, she nodded in affirmation. When the social worker approached Father, he asked if she was with Child Protective Services and told her "to leave his family alone" and "confirmed that he was unwilling to speak." When the DHS arrived at the hospital to take custody of B.J., Father became upset when B.J. could not immediately be placed with his sister and "began breathing heavily and appeared aggravated."[2]

The circuit court held an adjudicatory hearing in September 2024. At the beginning of the hearing, Father's attorney noted that he was "prepared to enter into the stipulation with regard to the aggravated circumstances nature of this case understanding there is no agreement as to disposition . . . ." The court, recognizing the absence of a written stipulation, proposed that Father testify regarding the portion of the petition to which he admitted, with his testimony in turn functioning "as essentially an agreed upon adjudication." Father's lawyer agreed, and the DHS called Father as a witness.

---

[2] The DHS sought emergency custody based on the prior termination for the "serious unexplained injury to R.K." because the parents had "not demonstrat[ed] any change in circumstances by lying to and/or refusing to speak with the [CPS] workers."

The DHS asked Father whether he "recently father[ed]" a child with the mother, which Father confirmed and named R.K. as "the first child [he] fathered with her[.]" Without objection by his attorney, Father agreed that his "parental rights" to R.K. were terminated and that he had since "fathered a second child[.]" He also admitted that, after the termination of rights to R.K., he had not participated in any parenting services or services to "develop better parenting skills[.]" Father also confirmed he did not previously admit "doing any type of wrongdoing or causing any harm to [R.K.,]" that R.K. suffered a spiral fracture of his arm, that the type of injury does not "occur spontaneously[,]" and that he "[took] responsibility for the injuries to [R.K.] at the time [R.K.] was in [his] care[.]" Additionally, Father admitted that he needed "additional types of parenting classes or other types of services" to assist him in acquiring the skills to "properly parent[.]"

While questioned by his attorney on cross-examination, when asked whether "his current situation and circumstances constitute a substantial change in [his] circumstances since the termination[,]" Father responded "[y]es" without further elaboration, and also affirmed that he would present evidence of changed circumstances as a basis for his request for an improvement period. Still, when the mother's counsel then questioned him, Father agreed that he took responsibility for the injuries to R.K., yet maintained that he "did nothing to him" and did not know how R.K. was injured or whether someone dropped him.

4

On redirect, the DHS asked Father if it would be inappropriate "at least at this time[,] for [Father] to have custody of [B.J]" because of the prior termination of his parental rights. Father responded affirmatively. He also acknowledged that R.K. had "an unexplained injury" and that the mother "could have caused that injury[.]"

The mother also testified at the adjudicatory hearing that Father "could have hurt [R.K.]." She stated that Father was not R.K.'s biological father. During her testimony, the DHS introduced as evidence the prior dispositional order terminating the mother and Father's rights to R.K.

A CPS worker testified about the 2023 termination and noted that Father never took responsibility for R.K.'s injury and offered no explanation of what happened to the infant. She also testified about her discussion with Father at the hospital shortly after B.J's birth, where, after she explained the situation and need for placement, he cried, grabbed himself, and fell to the ground.

At the hearing's conclusion, the DHS argued that both parents had a previous involuntary termination of "parental rights" because of R.K's "unexplained injury"—the spiral fracture. At the end of the hearing, the court found both parents to be abusive and neglectful parents and found B.J. to be an abused and neglected child.

The adjudicatory order, like the circuit court's findings on the record during the hearing, determined that B.J. was abused and neglected and his parents were abusive and neglectful. The order noted that the respondent parents previously had their "parental rights" to R.K. involuntarily terminated due to R.K.'s "unexplained spiral fracture" and quoted from the dispositional order in that earlier case. The adjudicatory order further found that Father was "in essentially in the same position as during the last case" as he had failed to "take any responsibility" for R.K.'s injury that occurred "while the child was in his care, and much like [the mother] he did not identify a possible cause to that injury and at that time he did not indicate that it could have been caused by [the mother]." The court found that "while [Father] acknowledged that he was responsible—it was in a vague sense—since he acknowledged it because the child was in his care[,]" he never previously indicated before the adjudicatory hearing that the mother "might have caused the injury to [R.K.]." Additionally, the court found that Father had not participated in any services since the termination related to R.K. and had "not experienced a change in circumstances since the termination of [his] parental rights."[3]

---

[3] These findings echoed the DHS's arguments at the conclusion of the adjudicatory hearing that there was "no evidence today that there has been any change in circumstance that led to the termination of either of their parental rights." At the hearing, DHS asked the court to adjudicate both parents "due to their prior termination of parental rights to [R.K.]" and to find "there has not been any evidence that either [parent] ha[s] experienced a substantial change in circumstance since the terminations of their rights previous. [sic]"

After the subsequent dispositional hearing, the circuit court found, via order, that there was "no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future." The court recognized, again, the "prior termination" and that "neither [parent is] willing to take any responsibility for the injury" that occurred to R.K. Quoting *In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013), and recognizing that "to remedy the abuse and/or neglect problem, the problem must first be acknowledged[,]" the court terminated both parents' parental rights to B.J. (Internal citation omitted in order). Father now appeals his adjudication.[4]

## II.

## STANDARD OF REVIEW

We recently synthesized and reiterated the standards we apply when reviewing circuit court determinations in abuse and neglect cases:

> This Court reviews the circuit court's orders in abuse and neglect proceedings using the three following standards: (1) substantive rulings, such as whether the evidence supports a conclusion that a child has been abused or neglected or whether termination of parental rights is appropriate, are reviewed for abuse of discretion; (2) factual findings supporting substantive rulings are reviewed for clear error; and

---

[4] This Court recently affirmed the circuit court's termination of the mother's parental rights to B.J. in *In re B.J.*, No. 25-232, 2026 WL 688908 (W. Va. Mar. 3, 2026) (memorandum decision).

(3) to the extent review of the order implicates an issue of law or requires statutory interpretation, our review is de novo.

Syl. Pt. 1, *In re K.S.*, No. 24-740, __ W. Va. __, __ S.E.2d __ (2026).

## III.

## DISCUSSION

Father asserts that the circuit court erroneously adjudicated him of abusing and neglecting B.J., contending that the circuit court based its adjudication "solely" on the prior termination of his "parental rights" to R.K.—which he argues was erroneous because he had no parental rights to R.K. and there was no other evidence of abuse and neglect of B.J.[5] He contends that the DHS had to prove a specific act of neglect or abuse committed by him "directly against B.J." because he was never found to be the father of R.K., and so his "parental rights" to R.K. were not terminated because he never had such rights. Father here appears to argue that he has suffered some sort of per se termination due to the previous termination of rights—albeit not parental rights—to R.K. We do not agree.[6]

_____

[5] In his second assignment of error, Father alleges that the circuit court erred in terminating his parental rights to B.J., but his argument focuses solely on his allegation that the adjudication was erroneous. For that reason, we consider only the whether the circuit court abused its discretion in adjudicating Father as abusing and neglecting B.J.

[6] Father also briefly alleges that the statute requiring the DHS to seek termination, West Virginia Code § 49-4-605, only requires that action when *parental* rights have been previously terminated. Certainly, DHS has a mandatory duty to file or join a petition in the circumstance that "the parental rights of the parent to another child have been terminated involuntarily[.]" *See* W. Va. Code § 49-4-605(a)(3). To the extent that Father contends that the DHS incorrectly or improperly filed this petition alleging that he abused and neglected B.J., nothing in the abuse and neglect statutory scheme precludes the DHS from filing a

8

Because Father challenges the circuit court's consideration of a prior involuntary termination, we first discuss how prior terminations may be considered by the circuit court when determining whether a subject child is abused and neglected. As we explain below, reviewing the evidence before the circuit court, we find the court did not err in adjudicating Father as abusing and neglecting B.J. based on the prior proceeding relative to R.K. and Father's current circumstances.

At adjudication, West Virginia Code § 49-4-601(i) requires the circuit court "to make a determination based upon the evidence," set forth in an order with written findings of fact and conclusions of law, regarding "whether the child is abused or neglected" and "whether the respondent is abusing, neglecting, or, if applicable, a battered parent[.]" *See also* W. Va. R. P. Child Abuse & Neglect Proc. 27. Those "findings must be based upon conditions existing" when the petition was filed. W. Va. Code § 49-4-601(i). The DHS has the burden of proving whether the child is abused or neglected by clear and convincing evidence:

> "*W. Va. Code,* [§ 49-4-601(i)], requires the State Department of [Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department

petition when prior rights other than parental rights have been terminated. Rather, West Virginia Code § 49-4-601(a) provides that if DHS "believes that a child is neglected or abused," it "may present a petition setting forth the facts" to the prescribed circuit court. Furthermore, the propriety of DHS filing a petition is not on appeal.

> of [Human Services] is obligated to meet this burden."
> Syllabus point 1, *In Interest of S.C.*, 168 W. Va. 366, 284
> S.E.2d 867 (1981).

Syl. Pt. 3, *In re B.L.-1*, 251 W. Va. 92, 909 S.E.2d 127 (2024). The DHS retains this burden, "even in a case in which there has been a prior termination of parental rights[.]" *In re K.L.*, 233 W. Va. 547, 552, 759 S.E.2d 778, 783 (2014) (per curiam). Finally, we have repeatedly recognized that "[t]he standard of proof required to support a court order limiting or terminating parental rights to the custody of minor children is clear, cogent and convincing proof." Syl. Pt. 2, *In re K.V.*, 251 W. Va. 418, 914 S.E.2d 517 (2025) (quoting Syl. Pt. 6, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973)).

Regarding prior terminations, "the DHS may file a petition based upon a parent's prior termination," but the petition must include "'specific allegations and evidence of abuse or neglect of [the child], which could include demonstrating that [the child] was abused and/or neglected by showing the petitioner failed to correct the conditions that led to the prior termination.'" *In re R.L.*, No. 23-223, 2024 WL 2946237, at *2 (W. Va. June 10, 2024) (memorandum decision) (quoting *In re K.L.*, 233 W. Va. at 554, 759 S.E.2d at 785) (alteration in *In re R.L.*).[7] In *In re R.L.*, the Court vacated a

---

[7] This Court has repeatedly rejected any automatic adjudication of abusing and neglecting a subsequent child, and subsequent termination of parental rights to that child, based on a prior termination. *See, e.g.*, *In re K.L.*, 233 W. Va. 547, 552, 759 S.E.2d 778, 783 (2014) (per curiam); *In re R.L.*, No. 23-223, 2024 WL 2946237, at *2 (W. Va. June 10, 2024) (memorandum decision). In *In re K.L.*, the Court reversed a circuit court's termination of parental rights when the petition recited only the mother's prior involuntary

termination of parental rights due to a faulty adjudication, as the petition only alleged the parent's prior termination, "but failed to allege that the [parent] had not corrected these conditions or that these ongoing conditions harmed or threatened" the child. 2024 WL 2946237, at *2. The Court noted that the adjudicatory order failed to "include any findings about the petitioner's prior termination and undertook no review of the issues that necessitated that termination[,]" and recognized that a prior termination, standing alone, could not provide the basis for an adjudication of abuse and neglect. *Id.* The *In re R.L.* Court vacated the adjudicatory order finding that the child was abused and neglected and explained that the petition *could have* "alleged that the conduct for which the petitioner was previously terminated had not been corrected"—but it did not. *Id.*

On the other hand, the Court has affirmed conclusions by circuit courts that parents were abusive and neglectful based upon evidence of a prior termination combined with the parents' failure to correct the conditions that led to that termination, as the subject

termination as grounds for abuse and neglect; during the proceedings, the circuit court at adjudication did not require the DHS to prove that the mother had abused or neglected the subject child and, instead at disposition shifted the burden to the mother to prove her circumstances had changed since the prior termination. 233 W. Va. at 551, 759 S.E.2d at 782. The *In re K.L.* Court explained that the petition was inadequate, as it "was based solely on the prior involuntary termination, without further allegations." *Id.* at 554, 759 S.E.2d at 785. Rather, the Court explained that the petition must contain "specific allegations and evidence of abuse or neglect of [the subject child]," giving, as examples, "demonstrating that [the subject child] was abused and/or neglected by showing the petitioner failed to correct the conditions that led to the prior termination of her parental rights and/or that other circumstances exist which would establish abuse and/or neglect." *Id.* at 554, 759 S.E.2d at 785.

11

child was still threatened by abuse. In *In re E.C.*, where parents challenged their adjudication as abusing and neglecting the subsequent subject child after a prior termination, the Court affirmed the circuit court, noting in regard to adjudication that the parents' "fail[ure] to acknowledge any of their conduct from prior proceedings" regarding sexual abuse and continued denial of wrongdoing showed that they failed to correct the conditions of abuse and neglect. No. 19-0834, 2020 WL 2043399, at *3 (W. Va. Apr. 28, 2020) (memorandum decision). The *In re E.C.* Court explained that the failure to acknowledge past abuse "clearly and convincingly shows that petitioners constitute a danger to [the subject child]" because an abused child includes a child whose health or welfare is "'*threatened by*'" sexual abuse or exploitation. *Id.* at *4 (quoting W. Va. Code § 49-1-201) (emphasis in *In re E.C.*). Because the parents in *In re E.C.* refused "to correct the past issues of sexual abuse" in their home, the Court found that the refusal "constitute[d] a clear threat to [the subject child.]" *Id.*[8] Likewise in *In re P.P.*, the Court considered whether a father's parental rights were properly terminated regarding a fourth child when the father's parental rights to three previous children were either previously involuntarily

___

[8] The *In re E.C.* Court reiterated these findings when affirming the circuit court's termination of parental rights, noting that the parents' "failure to acknowledge the conditions at issue have rendered them uncorrectable." No. 19-0834, 2020 WL 2043399, at *4 (W. Va. Apr. 28, 2020) (memorandum decision).

Other courts have explained their role as employing a "predictive" analysis when determining whether a subsequent newborn is abused or neglected, as the court must, essentially, "assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *Matter of J.A.M.*, 822 S.E.2d 693, 698-99 (N.C. 2019) (quoting *In re McLean*, 521 S.E.2d 121, 127 (N.C. Ct. App. 1999)).

terminated (one child) or voluntarily relinquished (two children). No. 18-1049, 2019 WL 2246228, at *1, *6 (W. Va. May 24, 2019) (memorandum decision). In upholding termination where the petitioner did not challenge his adjudication, the Court explained that the DHS "alleged, and the circuit court found, that [the subject child] had been abused and neglected because petitioner failed to remedy the circumstances of abuse by refusing to acknowledge the abuse of [an earlier abused infant]." *Id.* at *6.

Recently, this Court similarly affirmed the adjudication of B.J.'s mother as abusive and neglectful after the DHS alleged and proved "that the conditions leading to the termination of [the mother's] parental rights to R.K. had not been corrected." *In re B.J.*, No. 25-232, 2026 WL 688908, at *2 (W. Va. Mar. 3, 2026) (memorandum decision). In finding no reversible error by the circuit court in adjudicating the mother as abusive and neglectful, this Court noted that the evidence before the circuit court showed that the mother's circumstances since the prior termination of R.K. "remained unchanged, as she lied to hospital staff in an attempt to avoid CPS involvement, continued to deflect responsibility for R.K.'s injury, and remained equivocal at best regarding the child's abuser." *Id.*

Before this Court, Father emphasizes that his *parental* rights to R.K. were never terminated. Still, our inquiry is whether the circuit court erred when it determined that B.J. was abused and neglected by Father, based on conditions existing when the

13

petition was filed, and proven by the DHS by clear and convincing evidence.[9] W. Va. Code § 49-4-601(i); W. Va. R. P. Child Abuse & Neglect Proc. 27; Syl. Pt. 3, *In re B.L.-1*, 251 W. Va. 92, 909 S.E.2d 127. In view of the statutory scheme for adjudication that is more concerned with addressing threats posed to a child's welfare than with the legal nomenclature attached to the adults who care for them, we see no reason to limit a circuit court's consideration at adjudication of a prior involuntary termination and evidence that the respondent failed to remedy those conditions to only situations where *parental rights* have been terminated.

The abuse and neglect statutory scheme expands past the parental relationship and provides that any person with custodial or guardianship interests can be a respondent to a petition of abuse and neglect; the statute defines respondents as "all parents, guardians, and custodians identified in the child abuse and neglect petition who are not petitioners or copetitioners." W. Va. Code § 49-1-201. Furthermore, an abused child includes "[a] child whose health or welfare is being harmed or threatened by . . . [a] parent, guardian, or custodian who knowingly or intentionally inflicts, attempts to inflict, or

---

[9] We need not wade into the factual question of whether Father was or was not the biological father of R.K. The mother testified at the adjudicatory hearing regarding B.J. that he was not the father of R.K., yet Father testified he was R.K.'s father at the same hearing. Meanwhile in his brief, he contends that no finding was made in the case regarding R.K. to establish that he was the father. Whether he is the biological father of R.K. does not affect our analysis, and we make no finding as to that issue, particularly as Father did not raise this issue below and the circuit court made no specific finding as to this issue.

knowingly allows another person to inflict, physical injury or mental or emotional injury upon the child or another child in the home." *Id*. Finally, and particularly relevant to our inquiry, for the purpose of the child abuse and neglect statutes, "'[a]busing parent' means a parent, guardian, or other custodian . . . whose conduct has been adjudicated by the court to constitute child abuse or neglect as alleged in the petition charging child abuse or neglect." *Id.* Given these definitions, correspondingly the Court has affirmed the circuit court's adjudication of individuals as abusing and neglecting children when those individuals are not parents; the statutory scheme requires a court "to make a determination . . . whether the respondent is abusing, neglecting, or, if applicable, a battered parent[.]" W. Va. Code § 49-4-601(i); *see, e.g.*, *In re B.L.-1*, 251 W. Va. at 100-01, 909 S.E.2d at 135-36 (affirming adjudication of a grandmother as abusing and neglecting her grandchildren).

Whether parental rights or other rights are terminated, the DHS retains the same burden of proof of clear and convincing evidence that the subject child is abused and neglected. *See In re B.L.-1*, 251 W. Va. at 100, 909 S.E.2d at 135 (recognizing the DHS's burden of proof of clear and convincing evidence when considering a grandmother's adjudication of abuse and neglect). For the purposes of our inquiry regarding a prior proceeding, no difference exists between a custodian or other respondent whose rights are

15

terminated after being adjudicated for abusing and/or neglecting a child and a *parent* whose rights have been terminated.[10]

We turn to the circuit court's adjudication and determine that the court did not abuse its discretion in finding, by clear and convincing evidence, that B.J. was an abused and neglected child and that Father abused and neglected him. As in those cases discussed above that affirmed the adjudication of respondents as abusing and neglecting a subject child after prior involuntary terminations, the petition alleged, and sufficient evidence supported, the court's conclusion that Father had his rights previously terminated and that B.J. was abused and neglected because Father had not had a change in circumstances since that prior termination.[11] Like our findings relating to the adjudication of B.J.'s mother, the father's "circumstances remained unchanged" shortly thereafter at the birth of B.J., as he "continued to deflect responsibility for R.K.'s injury, and remained equivocal at best regarding the child's abuser." *See In re B.J.*, 2026 WL 688908, at \*2.

---

[10] As we have recognized above, under the defined terms of the statute, after a person has been adjudicated as abusing or neglecting a child, the statute defines that person as an "[a]busing parent" for the purposes of the abuse and neglect statutory scheme. W. Va. Code § 49-1-201.

[11] We acknowledge that the circuit court's language was imprecise as to which of Father's rights to R.K. were terminated, typically referring to them as parental rights. Yet, during the adjudicatory hearing, Father also agreed that his parental rights to R.K. were terminated, and as the State points out, regardless of what sort of rights Father had previously terminated, the State still "had the same burden of proof at the adjudicatory hearing regarding B.J."

While Father did not sign a written stipulation to the allegations in the petition, his attorney indicated his willingness to stipulate to the allegations in the petition and Father voluntarily testified at the adjudicatory hearing. As a witness called by DHS, he agreed that he had previous rights terminated (which he stated were parental rights), that he had not participated in any parenting services, and that he failed to admit to any wrongdoing in relationship to R.K.'s injuries. During his testimony, like B.J.'s mother, he was equivocal about what could have caused R.K.'s injuries. He even admitted because he had a prior termination of rights, his custody of B.J. would be inappropriate. Father now repeatedly argues that he did not abuse or neglect B.J. directly, as DHS took custody of B.J. at his birth. We recognize, however, that an abused child includes a child who suffers from threatened harm, which may include when a respondent has a prior termination and has failed to correct the conditions that led to the prior termination of rights, parental or otherwise. *See In re E.C.*, 2020 WL 2043399, at *3. We find that the circuit court did not err in adjudicating Father as abusing and neglecting B.J., as the DHS presented sufficient evidence to establish that Father had a prior involuntary termination of rights and had failed to remedy the prior circumstances of abuse that gave rise to the termination of his rights to R.K., thus placing B.J. in threat of harm.

## IV.

## CONCLUSION

For the reasons explained above, we affirm the October 1, 2024 adjudicatory order and March 19, 2025 dispositional order of the Circuit Court of Wood County adjudicating Father as abusive and neglectful and, in turn, terminating his parental rights to B.J.

Affirmed.